Malcolm P. McLEAN, Individually, Plaintiff,

v.

Jack ALEXANDER et al., Defendants.

Civ. A. No. 3972.

United States District Court, D. Delaware.

Aug. 13, 1976.

John J. Schmittinger of Schmittinger & Rodriguez, Dover, Del., William P. Verdon and Donald A. Kessler of Meyner, Landis & Verdon, Newark, N. J., for plaintiff.

Richard L. Sutton of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for individual defendants Jack Alexander, Daniel D. Friel, Bernard Hessler, Jr., individually and as Trustee for the children of Defendant Daniel D. Friel, Helen June Friel, Trustee for her children, Frederick A. Lang, Robert R. Walsh, Frank B. Francis, Martin A. Apostolico, Merle R. Aiken, Thomas B. Baker.

B. Wilson Redfearn of Tybout & Redfearn, Wilmington, Del., Russel H. Beatie, Jr., and John M. Friedman, Jr., of Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Shields & Co., Inc.

David Snellenburg, II, of Snellenburg & Sandstrom, Wilmington, Del., Francis J. Trzuskowski, of Trzuskowski & Kipp, Wilmington, Del., for defendant Cashman & Schiavi.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The instant action involves a suit based on alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5,[1] 17 CFR § 240.-10b–5. In addition, plaintiff has also sought recovery under principles of common law fraud and deceit. This opinion, following an 18-day trial, will constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a).

### PARTIES

The suit arose from the January 28, 1970, purchase by plaintiff Malcom P. McLean ("McLean") of 100% of Technidyne, Inc., a company founded in 1966 by three of the defendants. The defendants fall into three basic groups for liability purposes: the former individual Technidyne stockholders,[2] Shields & Company Incorporated ("Shields"), an investment banking corporation, and Cashman and Schiavi, a now-defunct accounting partnership. The accountants in turn cross-claimed against all other defendants seeking contribution.

Although plaintiff settled his claims against Shields and the individual stockholders midway through trial, his allegations of fraudulent conduct against Cashman & Schiavi remain extant. Similarly, the Cashman & Schiavi contribution cross-claim against the other defendants has survived the partial settlement, the sole modification being that plaintiff is now in the position of indemnifying Shields and the

---

1. Rule 10b–5 provides that:

    "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or for any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice or course of business which operates or would operate as fraud or deceit upon any person,
    in connection with the purchase or sale of any security."

2. Jack Alexander (130 shares), Daniel F. Friel (20 shares), Bernard Hessler, Jr. (80 shares as trustee for children of defendant Friel and 20 shares held personally), Helen June Friel (30 shares as trustee for her children), Frederick A. Lang (130 shares), Robert R. Walsh (100 shares), Frank B. Francis (10 shares), Martin A. Apostolico (4 shares), Merle R. Aiken (2 shares), Shelley P. Jones (8 shares) and Thomas B. Baker (1 share).

individual stockholders against the cross-claim. However, the particular factual context of the transactions that spawned this litigation requires that the acts and conduct of all parties be developed.

### Technidyne and Plaintiff's Purchase

Technidyne, Inc. ("Technidyne") was founded in December, 1966, by three of the individual defendants, Alexander, Francis and Hessler. Its primary purpose was the development of laser-beam technology and applications for use in the construction industry. For example, Technidyne developed a "Technitool," a pipelaying system that utilized a front and rear-beam laser unit designed to facilitate the installation of sewer pipe on a straight line and level grade. Traditionally, these tasks were accomplished by use of a batterboard, a method that has been relied upon for more than 2000 years.[3]

In the summer of 1969 Technidyne sorely needed an infusion of outside capital. Although it had succeeded in placing a number of its Technitools between February, 1967, and August, 1968, by virtue of an exclusive distributorship agreement[4] with American Vitrified Products ("Amvit"), the disintegration of this distributor relationship resulted in a virtual lack of sales during the first half of 1969. Accordingly, Technidyne approached Shields in July, 1969, to seek assistance in raising operating capital. Daniel Friel, a substantial Technidyne stockholder,[5] first approached Tilghman B. Evans of Shields, a prior business acquaintance of Friels.[6] While Friel's initial intention was to make a public offering of Technidyne stock, Evans indicated that such a plan was not feasible at that time for a company of Technidyne's size.[7] As a result, plans were instead developed, over a period of time, whereby Shields would undertake a private placement on behalf of Technidyne.[8] Under that concept Technidyne intended to issue some 225 shares of common stock at $2800 per share. Since some 535 shares of Technidyne were previously issued and outstanding, this would have increased the total amount of available Technidyne shares by approximately 40%.

Plaintiff McLean first heard of the Technidyne situation in late 1969 from R. N. Campbell, an engineer who had worked closely with McLean for a number of years. Campbell in turn had learned of the proposed private placement from Tim Evans of Shields, a personal acquaintance.[9] Both then and at the time of trial McLean was a man of considerable wealth, estimating his personal net worth as of January 1, 1970, in the area of $50 million.[10] Over the years Mr. McLean has been tremendously successful, having built first a trucking empire, McLean Trucking, and later a shipping empire, Sea-Land Services. In particular, McLean, in his Sea-Land venture, pioneered the concept of containerized shipping. In addition, McLean sat on the Boards of Directors of various publicly traded companies including McLean Industries, Chris-Craft Corporation and the R. J. Reynolds Tobacco

---

3. Under that method markers are first installed on each side of a trench at regular intervals. Scaffolds (batterboard) are then erected at the same intervals, generally 25 feet, and positioned so that the center nail of a batterboard forms a reference line with each marker. Following that operation a line is stretched from the various center nails to provide a straight continuous line with which to insure the correct horizontal positioning for the pipe. Finally, a plumb bob is used to ascertain the precise depth and grade of each pipe section. Technidyne's products were intended to replace this costly and time-consuming process by using a laser beam to provide a straight line forward and backwards in space designed to serve as a line of reference for pipe installation.

4. McLean Exhibit No. 3 ("McL. Ex. 3").

5. See n. 2. A total of 130 shares were owned by Friel, his wife, or a third party on behalf of his children.

6. Docket Item 99 at 10–12.

7. *Id.* at 12–13.

8. *Id.* at 15.

9. Alexander Exhibit I ("Alex. Ex. I").

10. Docket Item 178B at 113.

Company,[11] and had numerous and widespread financial interests in international trading, manufacturing, insurance and land development.[12]

During the late Sixties and early Seventies McLean was engaged in an extensive series of acquisitions of highly speculative, low performance companies manufacturing technologically-sophisticated products. For example, in 1966 McLean purchased one entity, Reuter-Stokes, that manufactured devices designed to provide information on the chemical content of oil in wells during the drilling process.[13] Another company acquired at that time produced detectors for use in functioning atomic reactors.[14] In addition McLean acquired companies which manufactured electron microscopes and mobilized hospital units and purchased a significant minority interest in an organization which made and designed blood-testing equipment.[15] However, McLean's personal diversification in this period was not restricted to technologically innovative or complex ventures, but included the 1969 purchase of a majority interest in a publicly owned land development company, Diamond Head, the 1970 acquisition of a 70% interest in the Loyal American Insurance Co. of Mobile, Alabama and the development of 100%-interests in international trading and packing-material manufacturing enterprises.[16] While the bulk of these investment opportunities were referred to him, McLean did make efforts to personally examine each investment, but was often assisted by one of his employees, Harry Jeter ("Jeter"), who also became involved in assisting McLean during his acquisition of Technidyne.[17] In sum, McLean is perhaps

the prototypical sophisticated investor, possessing significant business and investment experience and a very high degree of resources in the form of technological and business assistance.

In late 1969 Campbell forwarded information on the Technidyne opportunity to McLean.[18] Specifically McLean received a copy of a document entitled "Confidential Review of Technidyne, Inc." prepared by Shields.[19] This report ("the Shields Report"), dated November 20, 1969, provided various information on the company, its sales, earnings and future plans, as well as the scope of the planned offering of 225 shares of no par common stock. In particular, McLean understood that Technidyne's principal pipe-laying double-beam laser tool, the Model V, was a salable item. The Shields Report detailed that Technidyne had distributed its product exclusively through Amvit until early 1969, when " * * * Problems with this method of distribution led to the termination of the relationship in April, 1969, at which time the company began to sell the device direct." [20] Further, the report indicated that Technidyne sold 36 units in 1967 and 60 units in 1968 to Amvit, but that the 60 units represented half the amount Amvit had been contractually obligated to take during 1968.[21]

Shields also emphasized the company's recent sales record during the short time period since it embarked upon a course of direct selling. According to the Shields Report, Technidyne had hired a vice-president for Marketing and Sales in September, 1969, defendant Shelley P. Jones, who had succeeded in placing sixteen laser systems

---

11. *Id.* McLean Industries was merged into R. J. Reynolds in 1969.

12. Docket Items 178A at 18–23; 178B at 113–14; 150.

13. Docket Item 178B at 106.

14. *Id.*

15. *Id.* at 103–5.

16. Docket Item 178A at 18–9, 20–2; 178B at 107.

17. Docket Item B at 114.

18. See Alex. Ex. I.

19. Alex. Ex. A.

20. *Id.* at 2.

21. *Id.* at 9. Amvit was obligated to take 10 units per month. See McL. Ex. 3.

in less than three months.[22] Moreover, these sales [23] were accomplished with a staff of only two full-time salesmen. In addition, the report indicated a rosy future for Technidyne's program of selling through equipment dealers by suggesting a potential of more than 200 such dealerships. However, the report bore a legend prominently displayed on its inner title page which disclosed that "This memorandum prepared by the undersigned at the request of the above-named Company is based upon information furnished by officers of the Company and is not guaranteed by the undersigned. SHIELDS & COMPANY INCORPORATED."

After reading the Shields Report McLean dispatched Jeter to visit the Technidyne facilities in Wilmington on January 6, 1970. Although McLean instructed Jeter to examine only the technical aspects of the company's manufacturing process, Jeter's written report on his visit covered a broad range of subjects. Not only did his memo discuss manufacturing goals but Jeter also reported upon the amount of available stock and an apparent need for haste since he expected that the Technidyne arrangements with Shields would be closed the following week.[24] Also, Jeter gratuitously projected sales of $10 million within three years, a figure that appears to bear little relationship, if any, to information transmitted to Jeter in either a documentary or verbal form.

Moreover, during his visit defendants Jones and Friel, in the presence of Alexander and Walsh, the President and General Manager respectively of Technidyne, informed Jeter that the 16 sales referred to by Shields had since increased to 41 sales. Jeter also testified that he was either shown or received a document that has come to be known as the Friel Document.[25] Basically, the document makes sales projections of various Technidyne products, both the then extant Model V and other units designed for use in trenching and grading. With respect to the Model V pipe-laying equipment, three methods of sales projections using various allegedly factual bases were employed.

The first method simply utilized an estimate of the total number of sewer and pipe contractors in the United States, assumed the purchase of one laser tool by half of them and a market share for Technidyne of 30% and extrapolated a sales rate of 690 units in the fifth year. The other two methods are of far greater significance since they used as analytic bases the number of units supposedly sold by Amvit and by Shelley Jones in a three month period. Method B stated that "We know that Amvit, with a very limited sales effort, sold 114 units in 2½ years * * *." In addition, Friel and Walsh told Jeter that Technidyne had terminated the Amvit relationship in April, 1969, because Amvit, due to economic problems of its own, had decided to concentrate on selling its own pipe products and, as a result, sharply limited its efforts to sell Technitools.

Method C of the Friel Document began as follows: "Shelley Jones has received orders for 41 units in his first three months (the off season) as Marketing Manager in the southeast region alone." While this reference is solely to "orders," it is clear that Jeter, and later McLean, were consistently

22. Alex. Ex. A at 5.

23. See Id. at 9.

24. Alex. Ex. 54. This reference to the closing of financial arrangements between Technidyne and Shields cannot be interpreted as relating to a fee agreement between them since such matters had been finalized no later than November 20, 1969. See Alex. Ex. A at 1. Further, the indicated need for some haste if McLean was interested in pursuing the investment would be illogical if based solely on the finalization of a fee arrangement. Instead, this language must be interpreted as demonstrating a belief by Jeter that other investors were in the picture and that the Technidyne placement was likely to be concluded in the immediate future. This is supported by the fact that the original private placement had apparently been almost fully subscribed by early mid-December. See Docket Item 94, Deposition of J. Alexander at 70–1.

25. Alex. Ex. B.

told that these were 41 sales. Additionally, the context of the phrase indicates that the orders were being treated as sales by Friel and thus were probably denominated as orders because the units had not yet been delivered. At trial there were conflicts in testimony as to whether Jeter or McLean had received the Friel Document prior to the latter's purchase of Technidyne. However, the Court specifically finds that Jeter either received or was shown the document during his January 6th visit and that McLean was either shown or received it on a visit to Wilmington on January 13, 1970, or during a discussion with Friel at Shields' New York office on January 22, 1970. The Friel and Walsh explanations[26] that this was a purely internal document written by Friel some time after mid-January is not credible since the document itself can best be characterized as a selling device to be shown to prospective investors. Moreover, Friel's central role as the dominant negotiating figure in the private placement and subsequent sale renders it highly unlikely that this document was either written as late as he claimed or solely intended for internal use. In fact, one of the other defendants, Jack Alexander, recalled Friel telling him he had used this document as a reference during discussions with McLean and Jeter in Wilmington on January 13th.[27]

Jeter was also informed by Friel on the 6th that a certified audit of Technidyne would be forthcoming. The next day Jeter received a certified audit of Technidyne, Inc. for the eleven month period ending November 30, 1969, prepared by defendant Cashman & Schiavi.[28] Jeter, and McLean as well, were understandably interested in the audit, and, in particular, the listing of accounts receivable as a current asset. These receivables, which Cashman & Schiavi opined as being "Considered Fully Collectible," were listed as $73,733. This amount both Jeter and McLean interpreted, and correctly so, as representing almost en-

tirely the accounts due and owing as a result of the 16 recent sales referred to in the Shields Report, such sales being a portion of the 41 sales mentioned in the Friel Document and verbally emphasized by some of the individual defendants during face-to-face meetings. Thus, McLean and Jeter, relying upon the independence of the outside auditors, viewed the audit as confirming what they had previously been told and seen regarding the marketability of Technidyne's pipe-laying tool.

Subsequently on January 13, 1970, McLean paid a visit to the Technidyne facilities. He was accompanied by two Shields' employees, Sellew and Rade, and met extensively with Jones, Friel, Alexander and Walsh. In particular McLean felt that this trip, which was designed to provide him with an opportunity to look over the people and their product, confirmed the optimism expressed in the Shields Report regarding the marketability of the laser product. Furthermore, Jones and Friel represented that the 16 sales had grown to 41 within a very short time. In response to McLean's inquiries regarding the distributorship agreement with Amvit, he was told that Technidyne had terminated the agreement because Amvit had been a poor distributor.

By the end of this meeting McLean was predisposed towards a substantial investment in Technidyne.[29] Although McLean was aware that only a portion of the Technidyne stock was immediately available, his usual investment pattern did not contemplate his taking a minority interest in a highly speculative venture. Accordingly, he met with Dan Friel at Shields' offices to discuss the sale of *all* the Technidyne stock to McLean. During this meeting Friel utilized the Friel Document extensively in support of his efforts to promote a sale of all the stock at a substantial price. Although Jeter and McLean did visit Wilmington again on the 27th of January, McLean con-

---

**26.** None of the shareholder defendants actually testified at trial because of the partial settlement. However, prior to trial all parties agreed that all depositions hitherto taken would be admissible for all purposes.

**27.** Docket Item 94 at 13–17.

**28.** Alex. Ex. C.

**29.** See Alex. Ex. DA66.

cluded that he would purchase all of Technidyne on the 22nd.

The Technidyne deal was closed on January 28th by the execution of a Stock Purchase Agreement[30] by Jeter as agent for McLean and Dan Friel as agent for the selling shareholders. This agreement provided for the sale of all 535 shares of Technidyne common stock to McLean for the sum of $1,699,999.95. Of this amount approximately $400,000 was paid at the closing with McLean issuing some $1.3 million in non-interest bearing promissory notes for the remainder.[31] Prior to calculating the proportionate share of the down payment due to each shareholder, a proportionate reduction was made for Shields' commission. In addition, five stockholders who had previously received loans from Technidyne had the amount of their indebtedness deducted from the amount they received.

The closing was undertaken in great haste as the agreement to close the deal on the 28th was apparently not made until the previous day.[32] Given the limited amount of time available McLean made no attempts whatsoever to retain legal counsel on the 27th, nor had he sought legal advice at any point during his investigation of Technidyne.[33] At trial McLean testified that he understood that a Mr. Larabee, a New York attorney representing Shields, would also be acting on his behalf at the closing. However, it is difficult to find any basis in fact for this belief. McLean never made any efforts, either personally or through his various agents, to retain Larabee or to speak with him prior to the closing, nor did he ever receive a bill for or pay any fee for Larabee's legal services. In sum then, McLean's belief that he was indeed represented by legal counsel, a belief that dates back several years,[34] was totally unfounded.

One fact that remains something of a mystery is the hasty decision to close on the 28th. While it is not clear exactly who was pushing for an immediate settlement, a strong inference can be drawn that the impetus towards a speedy conclusion emanated from both sides of the negotiating table. First, information in the record suggests that the initial private placement had been virtually fully committed sometime in December, 1969. Plaintiff, through Jeter, was aware almost from the outset of his dealings with Technidyne that time was of the essence because of the impending completion of the limited private placement. Also, the private placement's expiration at the end of January and the shareholders' concern that if McLean thereafter backed out they would be left without any desperately needed capital were transmitted directly to McLean as part of a message that if he wanted the company he would have to move quickly.[35] On the other hand, plaintiff was equally eager to effectuate the transaction and demonstrated no reluctance whatsoever with regard to accepting an imminent settlement date. Aside from the deadline suggested by the defendant shareholders, there are strong inferences available which support the view that plaintiff believed it in his interest to move quickly. McLean was not interested in purchasing anything less than the entire company and had encountered some substantial difficulty, due to the reluctance of certain stockholders,[36] in negotiating a complete sale of all the stock. Thus, given his understanding that Technidyne had another completely viable financing option available and that some stockholders were opposed to

---

30. Alex. Ex. D.

31. These notes were never paid and the stockholder defendants counterclaimed against McLean for the amount of the outstanding notes. This claim was terminated by the partial settlement.

32. See Docket Item 178C at 66–76.

33. *Id.*

34. McLean's deposition taken in early 1971 reveals the same belief on plaintiff's part with respect to his representation at the closing. See Docket Item 157 at 413ff.

35. Docket Item 90 at 332; Docket Item 157 at 426–33.

36. See, e. g., Docket Item 94 at 83–5; Docket Item 151 at 65–7.

selling out, McLean may well have felt that a delay in closing the purchase might serve to be counterproductive of his avowed purpose of buying the entire company.

### The Accounts Receivable, Audit and the 41 Sales to Dealers

#### A. The 16 Sales

As previously discussed the certified audit of Technidyne prepared in January, 1970, by Cashman & Schiavi listed as an asset some $73,733 in accounts receivable. Included within these receivables were three dealership accounts which, according to the accountants and the individual stockholder defendants,[37] represented sales of 16 Model V pipe-laying units. These accounts were as follows:

L. B. Smith, Inc. of Virginia . . . . . $19,990.00
for 5 Model V Technitools

Robbins Instrument Service Co. . .   5,675.00
for 1 Model V Technitool

Southern Laser Co. . . . . . . . . . . . .   39,980.00
for 10 Model V Technitools

During the spring and summer of 1970, Edward Meyercord ("Myercord"), who had been installed as President of Technidyne following McLean's takeover, began to learn that all was not as represented. Instead, he discovered, in bits and pieces, both from his own sales personnel and from the various dealers themselves, that the arrangements with dealers were either of a consignment or guaranteed sale nature.[38] Before proceeding to a discussion of the facts surrounding each account, a short digression into the background of the certified audit is in order.

On or about December 10, 1969, the local accounting firm of Cashman & Schiavi was retained by Technidyne to prepare an opinion audit for the first eleven months of 1969. Although this accounting partnership was formed in January, 1969, Technidyne had been a client of Robert Schiavi's since early 1967 and he had done prior work for the company. At the time he was instructed to prepare a certified audit by defendant Walsh, Schiavi was informed and clearly understood that the audit was needed for purposes of Technidyne's then current campaign to attract outside investment capital. Moreover, he knew that Technidyne needed the audit as soon as possible and that some sense of urgency existed in view of Technidyne's extremely negative cash flow. In conducting the certified opinion audit Schiavi generally examined Technidyne's purchase orders and invoices, made occasional, but limited, inquiries of management and sent positive confirmation forms to the Model V "purchasers."

#### i) Southern Laser

Although the documentation regarding the 10-unit transaction with Southern Laser[39] does not specifically indicate that the sales were either on a consignment or guaranteed sale basis, there is little doubt that the actual nature of the agreement between Southern Laser and Technidyne were contrary to the precise terms of the purchase order. First, Thomas N. Methvin, the principal of Southern Laser, gave deposition testimony which indicated that he reached an agreement with J. Mark Thomas, a Technidyne salesman, to take the units and pay for them only if they were in fact

---

37. While the term "stockholder defendants" is employed, as appears from the narrative account, *supra* and *infra,* only certain identified stockholders were "active" participants in the McLean transaction. The remaining shareholders were "passive."

38. For purposes of this opinion a guaranteed sale is one where Technidyne agreed that a dealer would incur no payment obligation until a unit was resold, that Technidyne would insure the units were resold if a dealer proved unable to move them, that Technidyne would

simply take back any unsold units or some combination of the above policies. Although the distinction between a consignment and a guaranteed sale of the above nature is not a "bright line," such a distinction is of little moment in the context of this case. Instead, the important concept is simply that the various transactions with dealers cannot be considered as sales within the ordinary meaning of that term.

39. See Alex. Ex. 61a, 61b, 61c and 61d.

resold to contractors.[40] Moreover, Methvin stated that he told Thomas he simply didn't have the $40,000 necessary to pay for the units and that his sole motivation for signing a purchase order with contrary terms was that Thomas represented it had to be set up that way on Technidyne's books.[41]

While Thomas contradicts Methvin slightly with respect to the latter's access to $40,000, his deposition testimony serves to confirm Methvin's version in all material respects. Not only does Thomas specifically recall discussing Technidyne's repossessing any unsold units,[42] but following his initial discussion with Methvin in an Atlanta pancake house, he called his superior at Technidyne, Shelley Jones, to confirm his authority to enter into what he described as a "buy-back" arrangement with Southern Laser.[43] The purchase order was subsequently executed in Methvin's kitchen but Thomas did not memorialize in writing Technidyne's commitments to allow Methvin to pay for the units as they were sold and take back, at no obligation on Southern Laser's part, any unsold units. Apparently his motivation for not doing so was simply that Methvin didn't ask him to write it on the purchase order.

In addition, the consignment, or guaranteed sale, nature of the Southern Laser transaction is confirmed by two other factors. Thomas specifically knew that Methvin was in fact a salesman employed at that time by a construction equipment dealer in Atlanta and that Southern Laser's sole existence was in the person of Methvin.[44] Given this information, which had been communicated to Shelley Jones,[45] any belief that Methvin was in a position to assume a current $40,000 obligation would have been unlikely. In addition, in the fall of 1969 Technidyne was in dire financial straits and had not sold any laser units in several months. In view of a need to promote some sales of a relatively new product with little or no reputation, it is not surprising to find that three Technidyne salesmen, Thomas, Joseph Daniel and Robert Frew, had discussed, on a general policy level, the concept of guaranteed sales amongst themselves.[46]

ii) *L. B. Smith*

As with Southern Laser, the underlying documentation does not clearly indicate that the transaction involving five Model V Technitools was anything other than a sale, albeit an installment sale with an unspecified future delivery date for four of the five units.[47] However, there is a significant amount of evidence which supports a finding that this agreement cannot properly be considered as a sale. Arthur Norman, the Baltimore branch manager of L. B. Smith of Virginia, Inc., testified in his deposition that the arrangement he had negotiated with Bob Frew of Technidyne was that L. B. Smith agreed to specifically take only one unit and would be obligated to pay for any of the five units only upon resale to contractors. Further, the reason underlying this arrangement was that the laser pipe-laying tool was a new concept and Norman did not wish to be stuck with unsold units.[48]

Frew's deposition testimony certainly does not contradict Norman's version of the actual agreement. First, because of the nonexistent Technidyne sales record in October, 1969, Frew indicated, in response to a question regarding the terms of the L. B. Smith agreement, that: "Well, at that time I for one would do about anything, verbally, to get them [L. B. Smith] on the right track . . . ."[49] Moreover, while he had no specific recollection of having said that Technidyne would "buy back" any unsold

---

**40.** Docket Item 107 at 6–16; 27–9.

**41.** *Id.*

**42.** Docket Item 149 at 34–5; 55–6.

**43.** *Id.* at 56–7.

**44.** *Id.* at 28.

**45.** *Id.* at 32.

**46.** Docket Item 150 at 13.

**47.** See Alex. Exs. E(1) and E6(g).

**48.** Docket Item 110 at 8–16; 35–6.

**49.** Docket Item 150 at 10.

units, he was unwilling to testify that he hadn't given such assurances to Norman and appeared instead to defer to Norman's recollection regarding the nature of the transaction.[50] Finally, some support for this analysis of the L. B. Smith transaction may actually be found in the underlying sales documentation. The Technidyne purchase order,[51] executed on October 7, 1969, indicates that one unit was delivered at that time and that the remaining four were to be delivered "A.S.A.P." (presumably meaning "as soon as possible"). However, a Technidyne invoice dated November 30, 1969,[52] and sent to L. B. Smith shows that these four units were being held in Technidyne's warehouse. Thus the documents themselves would appear to be consistent with Norman's claim that the first unit was to be rented to contractors to generate interest and that the remaining units would only be delivered and billed if they were sold.

### iii) *Robbins*

The documentation on the Robbins Instrument Service Company ("Robbins") transaction, much like the other "sales," does not appear to be inconsistent with a conclusion that the delivery on September 23, 1969, was indeed a sale.[53] However, deposition testimony of Paul Robbins, the head of Robbins, clearly establishes that this was not a sale. Instead, the arrangement was that Robbins, a contractor's equipment dealer, would take one unit as a demonstrator and receive a commission if he sold it.[54] Although Frew, Robbins' prime contact at Technidyne, understood the agreement somewhat differently, he also maintains that Robbins correctly understood that he had no obligation to pay for the unit until it was resold.[55] Frew's recollection suggests that, at the very least,

this arrangement was a consignment. Further, Frew knew that Robbins did not have the funds to pay for the unit.[56] Significantly Frew felt Robbins could be of some importance to Technidyne so that during negotiations ". . . just to get him on our side he could say anything, and I'd go 'Oh, fine.' "[57]

The Technidyne purchase order indicates payment was due within 30 days of delivery which occurred on September 23, 1969. However, an invoice was issued by Technidyne nearly five weeks later which simply recited the payment terms as 30 days net, thus suggesting that payment was not due until December 30, 1969.[58] While this conflict is not so blatant as to independently give rise to an inference that no obligation to pay existed in the absence of a resale, the postponement of an overdue obligation may well indicate that someone at Technidyne other than Frew also believed that Robbins was under no duty at that point to pay for the previously delivered Technitools.

### B. *Cashman & Schiavi's Audit*

As mentioned previously, in conducting the Technidyne audit, Schiavi largely restricted his activities to the examination of purchase orders and invoices, the mailing of positive confirmations to dealers and the posing of limited inquiries to management. In total Schiavi issued four positive confirmation requests,[59] sending one to Southern Laser, L. B. Smith, Robbins and Erie Marine, a purchaser of tubes and a power supply unit who supposedly owed some $5,911.50 to Technidyne. Of these four positive confirmations, the very purpose of which is to provide an accountant with a specific response from an account acknowledging an amount as due, only one was ever returned. That confirmation,[60] from Erie

---

50. *Id.* at 10–11; 15; 17.

51. Alex. Ex. E6(g).

52. Alex. Ex. E(1).

53. Alex. Ex. F2(b).

54. See Docket Item 109.

55. Docket Item 150 at 19.

56. *Id.* at 20.

57. *Id.*

58. Alex Ex. F2(a).

59. See Alex. Exs. G–5, P–98.

60. McL. Ex. 99.

Marine, disputed more than a third of the amount shown on Technidyne's books and enclosed a prior communication to Walsh which explained the basis for their differences over the amount due. However, this dispute was not footnoted or otherwise mentioned in the certified audit.

In late December Schiavi was pressured by Walsh to speed up the audit since it was needed for purposes of attracting investors. Schiavi indicated to Walsh that the lack of confirmations was the prime cause of delay and indicated that without some form of responses the audit could not be issued. Walsh apparently communicated this obstacle to Shelley Jones because Jones then told Bob Frew and Joe Daniel to call their accounts, L. B. Smith, Robbins and Southern Laser, and tell them to send telegrams to Cashman & Schiavi.[61]

On December 29, 1969, Schiavi or one of his employees received two phone calls from Western Union. Although the actual telegrams[62] were not received for some time, the contents were read over the phone as follows:

"Affirmation of order for 10 Model 5 Technidyne Lasers for $39,995.00 is correct—Tom Methvin Southern Laser Co."

"This will confirm our purchase order number BA51794 for 5 Number 5 units to Technidyne—A. W. Norman, Branch Mgr L. B. Smith of Maryland."

Although these telegram messages did not, even remotely, confirm an *amount due and owing,* but instead referred solely to the customers' respective purchase orders, Schiavi relied fully upon them. Moreover, notwithstanding the fact that he knew absolutely nothing about the alleged purchasers or their credit worthiness, Schiavi made no efforts to contact the customers and verify the telegrams.

Today it is clear that the Southern Laser telegram was a fake, having been sent by Joe Daniel, a Technidyne salesman. Having been unable to contact Methvin following Jones' edict to call the customers, Daniel, knowing that Technidyne desperately needed outside funding, called Western Union in Atlanta and instructed them to send a telegram to Cashman & Schiavi.[63] Had Schiavi contacted Methvin at any point in the five-day period between receipt of the phone message from Western Union and the issuance of the audit, he would have learned that the telegram had been forged. However, in total and reckless disregard of the facts that he had never had any prior contact with, or knowledge of Southern Laser, that the telegram was a non sequitur in relation to the confirmations and that he had no way of knowing who sent it, Schiavi never bothered to contact Methvin.

The other telegram was actually sent by Art Norman of L. B. Smith, following a phone call from Bob Frew.[64] When Norman inquired as to the purpose of the telegram and mentioned the guaranteed sale nature of his deal with Technidyne, Frew assured him that the telegram was needed for purely internal purposes and would not affect the previous arrangements. Frew also called Paul Robbins and told him to send a similar telegram but he was apparently less successful since Robbins never gave any response to Cashman & Schiavi. Thus, without having received positive confirmations from three of four accounts representing nearly 90% of the dealer receivables and having no personal knowledge about any of the dealers since they were all new accounts, Schiavi issued a certified audit indicating that the accounts receivable were genuine. Further, without any documentation or management inquiry as to the dealers' financial status, he stated that the accounts were "Considered Fully Collectible."[65]

---

61. Docket Item 150 at 54–6; Docket Item 118 at 45–51.

62. Daniel Ex. 1.

63. Docket Item 118 at 45–51.

64. Docket Item 150 at 57.

65. Even Cashman & Schiavi's own accounting expert opined he would have made a credit check before taking the additional step of certifying the accounts as "fully collectible." Since a subsequent Dun & Bradstreet report indicated the non-existence of Southern Laser anywhere but in Methvin's kitchen, there is little doubt that a proper credit check by

There were other serious deficiencies in Schiavi's conduct of the audit. The three Technidyne invoices sent to Southern Laser, L. B. Smith and Robbins were all issued on November 30, 1969, the cutoff date of the audit. Although this by itself is not a cause in and of itself for management inquiries, there were other facts which should, assuming Schiavi had any concern for the duties of his profession and was not simply succumbing to Walsh's pressure, have made this a significant fact. First, the respective purchase orders had been issued on November 8th, October 7th and September 23rd. Secondly, two of them contain payment terms contradicted by the subsequent invoices. Technidyne's October 7th L. B. Smith purchase order [66] required a one-third payment within 60 days, but the invoice [67] indicated the first payment was due in mid-January. Similarly, Technidyne's Robbins purchase order [68] required payment in full by October 23rd and yet the invoice,[69] issued some five weeks after the debt was due, sought payment by December 30, 1969. Given these conflicts and the fact that the initial payment dates for these two accounts had passed by the time Schiavi commenced work on the audit, the accountant's total lack of concern is readily apparent. In contrast, Schiavi did inquire of Walsh as to why an invoice was issued to Southern Laser when the purchase order indicated the first payment was not due until January 8th. However, this inquiry is somewhat puzzling in relation to Schiavi's inaction on the other two conflicting orders and detracts from Schiavi's trial testimony that he perceived no need for management inquiries where invoices were inconsistent with the purchase orders.

In addition, there was a conflict with respect to the shipping terms indicated on the L. B. Smith purchase orders which indicated that the four units not delivered were to be shipped "A.S.A.P." Schiavi concluded that this meant they would be shipped as soon as possible. However, not only does the L. B. Smith invoice indicate that four units were being held at Technidyne's warehouse, but Schiavi personally observed the units and noted on his worksheets that the units were being so held.[70] Thus, Schiavi's explanation is not credible and a more reasonable conclusion is that he paid little or no attention to the terms shown on the documents.

Finally, having noted that in addition to the L. B. Smith units, all ten of Southern Laser's units were being held for "drop shipment" [71] Schiavi concluded that Technidyne had a bill and hold practice. However, he made no inquiries of management on this subject, had no track record with respect to either of these dealers and simply assumed that the units had been sold but were being held pending further instructions. Nor did he make any notations of such a practice on the certified audit. Given the virtually complete "in futuro" character of these two accounts, combined with the postponement of payment terms and the contradicted shipping terms, there is a reasonable inference that the units were not sold at all, but were merely assigned to the dealers on a consignment basis. As a result, Schiavi's gratuitous [72] assumption of a bill and hold practice and his failure to raise any questions with management in view of the numerous flaws, must be taken as strong indications that Schiavi's concern

Schiavi would have revealed Southern Laser's inability to pay a $40,000 debt. See Alex. Ex. G(e)(e) and (f); Docket Item 1780 at 110–4.

66. Alex. Ex. E6(g).

67. Alex. Ex. E1.

68. Alex. Ex. F(2)(b).

69. Alex. Ex. F(2)(a).

70. See Ex. P–100.

71. See Ex. P–100; · Alex. Exs. G(1)(a) and (d).

72. Technidyne had previously utilized a bill and hold practice with Amvit but this is not a sufficient basis for Schiavi's conclusion in view of the duty owed to the public by accountants operating in a context where investors will utilize their reports. Moreover, Southern Laser and L. B. Smith were unlike Amvit which made a substantial downpayment, was billed and paid promptly on a monthly basis, and was contractually committed to take a set number of units each month.

for factual truth was outweighed by his interest in providing Walsh and Technidyne with a speedy audit.

### C. *The 41 Sales*

As previously detailed plaintiff was informed, both orally and by the Friel Document, that 41 sales had been made by Shelley Jones during a three-month period. These sales included the 16 sales referred to in the Shields report and 25 alleged sales that occurred subsequent to November 30, 1969. Upon analysis however, it is clear that the three transactions which apparently formed the additional 25 sales cannot be considered sales. Moreover, unlike the 16 sales, the underlying documents unequivocally refute any suggestion that bona fide sales of 25 units were made.

Ten units were allegedly sold to A. E. Finley & Associates of Tennessee, Inc. On December 5, 1969, representatives of Finley executed a blanket purchase order for 10 units.[73] In addition two A. E. Finley purchase orders were issued, each covering one unit with instructions that they be shipped to Knoxville and Nashville respectively. The Finley purchase order specifically noted that "Units to be shipped and released per written purchase orders at our discretion." More importantly, one copy of the Technidyne purchase order[74] had a handwritten legend on the bottom which stated that: "If units are not sold Technidyne will take back with no billing to A. E. Finley & Assoc.—J. Mark Thomas." This language, which was added by Thomas at the insistence of Finley personnel and was communicated to Shelley Jones[75] clearly indicates beyond doubt that this transaction cannot be denominated as a sale of 10 units.[76]

Five units were allegedly sold to Hubbard & Floyd, a New Jersey equipment dealer. While the documents indicate the transaction was not finalized until January 30, 1970, some two days after the Technidyne closing, it had become firm sometime in mid-December,[77] being referred to in an internal Technidyne sale report issued on December 26, 1969.[78] There is no question but that the Hubbard & Floyd agreement was either a guaranteed or a consignment sale. Pasco Job, Hubbard & Floyd's General Manager, stated that his understanding was that no obligation to pay for the units existed in the absence of a resale,[79] a position that is supported by Mark Thomas, the salesman who closed the account, who specifically recalled telling Job that it was a guaranteed sale.[80] Moreover, Hubbard & Floyd's purchase order[81] noted that one unit was to be shipped immediately with the other "four to be held in inventory until called for. . . ." Nor was there any time period during which the additional units were to be shipped. Instead, the units would be called for only as the previous unit was sold to a customer.[82]

The remaining ten "sales" are something of a mystery. Perhaps the only clue to the alleged purchaser is an internal report entitled: "Technidyne Orders Model V—3 Months—Sept. to Dec. 1969"[83] which refers to a 10-unit order by someone named Rankin from Kentucky. Beyond this scanty reference there is nothing in this record from which I can conclude that this transac-

---

**73.** Alex. Ex. H(1)(f); See Alex. Ex. H(3)(c).

**74.** Alex. Ex. H(2)(b). An additional copy of this purchase order without the additional handwritten language exists. Alex. Ex. H(2)(a). While this might have some relevance with respect to particular stockholder defendants' state of knowledge, it does not affect the probative value of the legended purchase order as a means of conclusively proving that the A. E. Finley transaction was not a sale.

**75.** Docket Item 118 at 7–8, 10. Docket Item 149 at 12–3, 49–52.

**76.** Docket Item 106 at 15.

**77.** Docket Item 149 at 89.

**78.** McL. Ex. 56.

**79.** Docket Item 108 at 10–15.

**80.** Docket Item 149 at 89.

**81.** Alex. Ex. 54(f).

**82.** Docket Item 108 at 15.

**83.** McL. Ex. 56.

tion ever progressed beyond a preliminary stage.

### D. *Amvit and the 96 or 114 Sales*

In the spring of 1970, Meyercord, who had been installed as the new president of Technidyne, visited the Amvit facility in Cleveland, Ohio. His purpose in traveling there was basically to find out how Amvit had been able to sell so many laser tools since Technidyne had been running into extreme marketing difficulties. While there, Meyercord learned that Amvit had sold only 30 to 35 Technitools and still had an inventory of approximately 70 units.[84]

Somewhat incredulous, Meyercord, in a telephonic follow-up, asked John J. McQueeney, Amvit's Marketing Manager, to fully document their position regarding the number of Amvit units that had been sold. As a result, a complete documentation[85] of Amvit's inventory and sales was dispatched the following day. From this list Meyercord understood that Amvit had sold no more than 30-odd laser units. A check of the warranty cards received from Amvit as units were sold to customers revealed a similar number.[86] Prior to receipt of the documented inventory data from Amvit, Meyercord had passed his initial findings on Amvit along to Harry Jeter. Jeter, in turn, met with Friel and told him what Meyercord had learned. Friel pretended to total and utter disbelief and ultimately dismissed Jeter by telling him to check the facts.[87] Having examined numerous documents and analyzed the testimony, the Court concludes Jeter's facts were accurate.

Under the exclusive distributorship agreement between Amvit and Technidyne,

Amvit was obligated to purchase a minimum of 24 units by July 31, 1967 and 10 units per month thereafter. In May, 1968, because of a tremendous inventory backlog at Amvit, this contract was amended to permit Amvit to take no units in May and only 5 in June and July.[88] Despite Amvit's efforts[89] to reduce the Technitool inventory through sales, Amvit was unable to eliminate their high inventory. The primary obstacle to sales was the poor quality of the laser units which demonstrated itself in an unusually high degree of failures and breakdowns shortly after delivery.[90] Further, Walsh and Alexander were informed in early May, 1968, that Amvit's inventory of unsold units was in the neighborhood of $250,000 or, at the contract price of $3600 per unit, approximately 70 units.[91]

As a result of continuing reliability problems which, in turn, precluded any significant amount of sales, Amvit advised Technidyne on August 20, 1968, that it was refusing to take any more units until the quality problems were solved.[92] In essence, this was the death knell of the distribution agreement. However, the relationship between Amvit and Technidyne did not end at that point but efforts continued for several months to resolve Amvit's inventory problem.

During this period numerous meetings were held by Technidyne and Amvit personnel and a substantial amount of correspondence passed between the two entities. In a September 9th letter to Alexander, McQueeney reiterated the August 20, 1968, refusal to take any more units and additionally demanded that Technidyne upgrade the quality of Amvit's existing inventory and

---

84. Docket Item 178F at 173.

85. See McQueeney Ex. 8.

86. Docket Item 178F at 174.

87. Docket Item 178D at 83–4. See discussion *infra* at 42.

88. McL. Ex. 14(a) and 15.

89. These efforts included holding trade shows in various parts of the country, the production of a movie designed as a visual selling aid, the

hiring of three civil engineers to specialize in laser sales and a national advertising campaign in trade journals. See Docket Item 148 at 2–18.

90. *See, e. g.,* McQueeney Ex. 7.

91. Docket Item 148 at 30; McL. Ex. 13.

92. McL. Ex. 21.

the units previously sold by customers.[93] At a meeting on September 13, 1968, with Alexander and Walsh, Amvit was informed that Walsh had identified the cause of the numerous unit failures (primarily related to the tube).[94] In addition, Amvit agreed to provide an up-to-date list of all units then in service.[95] One week later such a list, showing perhaps 20-odd sales, was sent to Bob Walsh.[96] A few days later, J. C. Monday, then president of Amvit, met with Alexander and indicated that until their inventory was reduced to an acceptable level, roughly 10 units, they would purchase no more units.[97]

Amvit continued to experience numerous unit failures, notwithstanding the new tubes that had been installed in the units.[98] As a result continued marketing efforts were unsuccessful.[99] Accordingly, another meeting was held in December, 1968, by Amvit with Alexander and Friel who, by that point, had apparently begun to take a more active role in Technidyne affairs,[100] motivated no doubt by the weakening financial position of Technidyne. Not only were the continuing quality problems discussed, but reference was again made to the $250,000 inventory level.[101] At that point Technidyne felt its financial situation was critical,[102] a view expressed in a follow-up communication from Jack Alexander to Amvit's president. However, Amvit, believing it had invested too much in the Technitool venture, rejected both of Alexander and Friel's counterproposals which would have required Amvit to either take three new units a month for the next four months or loan Technidyne $50,000.[103] Not surprisingly, especially since Amvit had taken no new units since August, Technidyne formally cancelled the distributorship agreement.

Although various stockholder defendants continuously urged during trial and informed plaintiff and his agents that the contractual relationship failed because Amvit's true concern was with its own pipe sales and thus did not make adequate efforts to market the laser units, there is little or no support in the record for such an explanation. Instead, the agreement disintegrated because of the high inventory and unmarketability of the units, caused primarily by the extremely high degree of product malfunction.

### Discussion

From the detailed factual presentation above, it is clear this is a case of a highly sophisticated investor who without benefit of counsel purchased a small closely held company with a negative book value of $66,331 for $1.7 million on basis of representations made by corporate shareholders, the qualified report of an investment banker and the opinion audit of an accountant who reported as "fully collectible" $73,733 in accounts receivable. In light of a settlement between the purchaser plaintiff and both the shareholders and investment banker, the primary issue before the Court is whether the accountant proceeded in a deliberate, knowing or reckless manner in the preparation of his audit such that plaintiff, relying on material information provided or omitted by defendant, incurred a loss protected by section 10(b) of the Securities Exchange Act of 1934.

The gravamen of McLean's complaint is that Schiavi knowingly or recklessly represented to McLean as a member of the investing public, that Technidyne had "hard" sales whereas in fact the underlying trans-

---

**93.** McL. Ex. 15.

**94.** Alex. Ex. 81.

**95.** Id.

**96.** McL. Ex. 23. See also Sullivan Ex. 5.

**97.** McQueeney Ex. 6.

**98.** Docket Item 146 at 44.

**99.** Id.

**100.** Docket Item 146 at 40–48.

**101.** Id.

**102.** McL. Ex. 33.

**103.** Id.; Whatley Ex. 4.

actions were merely consignments or guaranteed sales.

■ Whether Congress originally envisioned that the "catchall" 10(b) and administrative rule of 10b–5 provide a private cause of action for damages or not, such 10(b) actions are now commonplace. *Supt. of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169, 30 L.Ed.2d 128, 134 (1971). *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946). L. Loss, Securities Regulation 3870 (Supp. 1969). The judicially created right to damages under 10(b) is dependent upon several elements of proof. Traditionally, the plaintiff had to establish his reliance and more recently his due diligence, the culpable state of mind of defendant and the existence of a material misrepresentation or omission made in connection with the purchase or sale of a security.

## I. *Materiality*

■ Section 10(b) and Rule 10b–5 are designed to protect the investing public by promoting disclosure and the free flow of information and do not attempt to create violations for misstatements or omissions of a trivial nature. The well established principle that the critical statement or omission be material is undenied. Materiality is measured by an objective test which asks whether "a reasonable man would attach importance [to the misrepresentations or omissions] in determining his choice of action in the transaction in question." *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965). *Accord, Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 408 (3d Cir. 1974). Should the plaintiff fail to establish the materiality of statements on which he relied, he is barred from recovery and the court need not proceed to the issue of plaintiff's reliance. *Harnett v. Ryan Homes, Inc.*, 496 F.2d 832, 839 (3d Cir. 1974).

The materiality of a statement purporting to represent the accounts receivable of a sales company is easily determined. Defendants' argument that the existence of accounts receivable was immaterial to McLean is belied by the fact that they established the marketability of the Technidyne laser product. Defendants' second argument that any misrepresentation concerning the accounts receivable is immaterial because the total amount represented an insignificant percentage of the purchase price (4.6%) and therefore influenced neither McLean's decision to buy nor the amount of the purchase price which he paid is more credible. While McLean certainly does not maintain that he expended $1.7 million to recover $73,333 in accounts receivable, the latter represented, in addition to 40% of the total assets, the existence of the 16 sales related to McLean by some of the individual shareholders and Technidyne's investment banker. Evidence that sales of a fledgling and limping enterprise have dramatically increased from zero to 16 within a three-month period is probably the most important of indicia by which a prospective buyer can gauge whether the product being offered has a reasonable chance of sufficient marketability acceptance so as to ultimately be commercially profitable. Thus, the certified financial statement independently identified Technidyne as an ongoing viable business with current accounts receivable which, based upon what McLean had been told, would logically appear as the end result of current sales.[104]

■ Accordingly, it is concluded that a reasonable person in the position of considering an investment in Technidyne would certainly deem important its certified audit with particular emphasis upon the accounts receivable as independent confirmation of the existence of sales. Thus, Schiavi's representations and omissions relating to the accounts receivable in his audit are held to be material.

## II. *Reliance*

■ The accountant contends that even if his statements were material, the

---

**104.** The Court recognizes that accounts receivable are not always indicative of current sales, but under this record it is clear that defendant intended them to represent sales and that McLean understood them as such.

plaintiff did not rely on the audit and has therefore failed to establish a causal relationship between defendant's certified report and plaintiff's loss. Causation is understood to be an essential element of a private action for damages, lest 10(b) "establish a scheme of investors' insurance," *List, supra,* 340 F.2d at 463, by which "defendants could be held liable to all the world." *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1292 (2d Cir. 1969). Causation is established by "the reliance requirement [which] provides the causal link between the non-disclosure [or misrepresentation] and the loss suffered." *Rochez, supra,* 491 F.2d at 410; *accord, Johns Hopkins Univ. v. Hutton,* 326 F.Supp. 250, 258 n.11 (D.Md.1971).

■ The complaint alleges that McLean relied upon the audit prepared by Schiavi who knowingly and recklessly "represented false statements of material facts and omitted to state material facts." [105] In non-disclosure actions because of the insurmountable difficulties of proof, no significant showing of reliance is required. In such actions the materiality of the statement presupposes reliance and the "causation in fact test" is substituted for positive proof of causation. *Harnett v. Ryan Homes, Inc., supra,* 476 F.2d at 838 n.20; *Shapiro v. Merrill Lynch,* 495 F.2d 228 (2d Cir. 1974); *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255 (3d Cir. 1972); Bromberg, Securities Law: Fraud—SEC Rule 10b–5 § 8.6(2) at 212 (1975).

■ In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), two employees of a bank were held liable for failing to disclose information regarding the true value of stock to members of a large class of shareholders. The court found that "all that is necessary is that the facts withheld be material" and that the "obligation to disclose and the withholding of a material fact establish the requisite element of causation in

fact." *Id.* at 153–54, 92 S.Ct. at 1472. Similarly in *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir. 1974), one partner failed to disclose information to the other regarding negotiations for sale of their business. The court concluded that in cases of non-disclosure "proof of reliance is not required for recovery" and that the "burden of proof rests squarely upon defendant to establish the 'non-reliance' of plaintiff." *Id.* at 410. Accordingly, it is held that to the extent plaintiff claims reliance on omissions, the proper test of causation is "whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." *List, supra,* 340 F.2d at 463; *Rochez, supra,* 491 F.2d at 411. Further, I find, to the extent applicable, [106] defendant has completely failed to prove the nonreliance of plaintiff because he has not established that McLean would have acted in the same manner if he had known the non-disclosed facts.

■ But where an individual alleges a violation based on material misrepresentations as opposed to non-disclosure, there is wisdom in the rule that actual reliance must be demonstrated. This is so notwithstanding the fact that every half-truth, by definition, has elements of non-disclosure, namely the withheld information which results in the fact presented being labeled a misrepresentation. As between actions based on non-disclosure and those based on misrepresentations, the instant case is more properly characterized as one of misrepresentation. As a consequence, the plaintiff must establish that " 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss.' " *List v. Fashion Park, Inc., supra,* 340 F.2d at 462. *Accord, Kohn v. American Metal Climax, supra,* 458 F.2d at 288 (3d Cir. 1972) (Adams, J., concurring).

■ McLean's reliance on the misrepresentation of accounts receivable in the

---

**105.** Docket Item 1 at 24–26.

**106.** As appears in the factual recitation, *supra,* and letter in the text, *infra,* given the account-

ant's knowledge, one could persuasively argue the matter sub judice could be labeled as an "Omissions" case because of what the accountant failed to state in his audit.

opinion audit is established by McLean's testimony that he received and read the audit before deciding to buy Technidyne on January 22, 1970. There is no requirement that the plaintiff establish sole reliance or even primary reliance upon the audit, only that it was a "substantial factor" in his decision. *Johns Hopkins Univ., supra,* 326 F.Supp. at 260 *quoting List v. Fashion Park, Inc., supra,* 340 F.2d at 462.

Among the factors in his decision to buy Technidyne was McLean's confidence in both the product itself and in the incumbent management. McLean's visit to Technidyne confirmed the favorable impressions of his assistant Jeter and engineer Campbell. Beyond mere impressions, McLean relied upon management's Friel Document and the Shields Report based on information supplied by the company. However the only independent documentation he possessed was the Cashman-Schiavi opinion audit which proclaimed the accounts receivable to be "considered fully collectible." The audit reflected current sales activity and most importantly confirmed the marketability of the laser product as represented by both the principals and the Shield Report.

Defendant's claim that McLean would have purchased Technidyne irrespective of any material misrepresentation in the audit is pure speculation unsupported in the record. Had McLean received a complete and accurate financial picture of Technidyne, he could have made the informed judgment which the securities laws seek to promote.[107] In that McLean had the audit statement, and reasonably concluded from it that the receivables represented sales and not consignments, his reliance on the opinion is established.[108] Evidence that other factors played a part, however significant, in his deliberations does not compel the conclusion, that McLean was indifferent to the information contained in the report.

The question of whether plaintiff's reliance, albeit actual, was a reasonable reliance not only goes to challenge the materiality of the statements made or omitted but also raises the issue of whether due diligence was exercised by the plaintiff.[109]

### III. *Due Diligence*

■ The requirement that plaintiff exercise due diligence arose as a defensive response to the increasing number of private actions brought under 10b–5. Along with the *Birnbaum*[110] purchaser-seller rule reaffirmed in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the defense of due care sought to limit the scores of plaintiffs seeking relief under 10b–5. Due diligence imposes on the plaintiff the duty to act with the caution expected of a reasonable person in his position. In short due diligence requires plaintiff to demonstrate that whatever actual reliance he claims is well-founded. Wheeler, Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy, 70 *N.W.U.L.Rev.* 561 (1976); Note, The Due Diligence Require-

---

107. McLean testified, on cross-examination in response to the question whether he would have purchased if he had known that the sales were only consignments,

"[I]f I had been told the truth, sir, I would have had the opportunity to appraise what I was buying." Docket Item 178C at 45.

In response to the question as to what he would have done had the report shown a zero balance, McLean said:

"I don't know what I would have done. If it had shown a zero balance, I would have probably said 'what happened to the sales?' 'Did they sell them for cash?' 'Or where is the money?'" Docket Item 178A at 95.

108. He also testified that he read and relied on the trustworthiness of the report to establish

that Technidyne was an ongoing business with current sales. Docket Item 178A at 102–03.

109. Note, Reliance Under Rule 10b–5: Is the "Reasonable Investor" Reasonable? 72 *Colum. L.Rev.* 562, 566 (1972); Note, Two Different Standards of Reliance Applied in Individual Private Damage Actions Under SEC Rule 10b–5 by the Second Circuit. 49 *Temp.L.Q.* 182 (1975) in which the author discusses "constructive reliance" (materiality) and "subjective reliance" (due care).

110. *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

ment for Plaintiffs under Rule 10b–5, *1975 Duke L.J.* 753 (1975).

Whereas the test of materiality requires that the information be objectively important to a reasonable person, the duty of due care mandates that the plaintiff assess the information as would a person similarly possessed of his degree of business expertise. Thus, the duty to investigate the facts surrounding a securities transaction which attaches to the sophisticated investor is greater than the corresponding duty of a novice. Compare *Eichen v. E. F. Hutton & Co.,* 402 F.Supp. 823 (S.D.Cal.1975), with *Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir. 1974).

Sophisticated investors who possess either special expertise or the resources available to draw upon expertise, may be deemed to have knowledge of certain investments and their attendant risks, whether in fact they do or not and irrespective of whether material information was actually disclosed. Likewise, persons with vast business experience are similarly charged with a high degree of knowledge. *See Harnett v. Ryan Homes Inc.,* 496 F.2d 832 (3d Cir. 1974); Note, The Due Diligence Requirement for Plaintiff Under Rule 10b–5, *Duke L.J.* 753, 768 (1975); Note, Reliance Under Rule 10b–5: Is the "Reasonable Investor" Reasonable, 72 *Colum.L.Rev.* 562, 567 (1972). When, however, there is no access to the critical information nor opportunity to discover the fraud, even the sophisticated investor can be defrauded. *Straub v. Vaisman,* 540 F.2d 591 (3d Cir. 1976); *Rochez v. Rhoades, supra.*

Analogous to the defense of contributory negligence, the duty of due care came into prominence as liability imposed on defendant was erroneously expanded to include negligence and innocent misrepresentations. The widely accepted rationale was that if a defendant were potentially liable for statements made without specific fraudulent intent, fairness dictated some requirement of caution by plaintiff.[111]

Recent pronouncements by the Supreme Court point toward the necessity for reassessment of the due diligence defense. For example, where actual reliance need not be proved, as in the *Ute-Rochez* non-disclosure situation, it is futile to ask the question whether such reliance befits a person of similar stature.[112] Similarly, the Supreme Court's conclusion in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that negligence and innocent misrepresentations are inappropriate criteria on which to base 10b–5 liability subjects the contributory negligence aspect of due diligence to further review. The validity of the due diligence defense as asserted against a plaintiff who proceeds on a theory of actual intent to defraud has been openly questioned. *Straub v. Vaisman, supra. But cf. Holdsworth v. Strong,* 10th Cir., No. 75–1144, February 27, 1976; *Wheeler,* Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy. 70 *N.W.U. L.Rev.* 561, 583 (1975). There is, however, a wide spectrum of prohibited behavior between negligence and specific intent to defraud. In that uncharted land of knowing and reckless misconduct, defendant should be entitled to contest liability by asserting a due diligence defense. *Wheeler,* Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy, 70 *N.W.U.L.Rev.* 561, 587 (1975). Accordingly, under the circumstances of this case, McLean is charged with a duty of due diligence commensurate with his investor sophistication acquired by reason of his experience in acquisitions and mergers.

111. At least 8 Circuit Courts of Appeals recognize a duty of due care. *Wheeler,* Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy, 70 *N.W.U. L.Rev.* 561, 574, n.42 (1976).

112. The duty of due care may survive the demise of reliance if it is viewed as a separate element of a 10b-5 cause of action or the analysis begins with materiality of the statement,

i.e., one uses the reasonable person standard and then adjusts it up or down depending on the sophistication of plaintiff. Note, The Due Diligence Requirement for Plaintiffs Under Rule 10b-5, 1975 *Duke L.J.* 753, 759–61 (1975).

However, charging McLean with a duty to use due care does not end the inquiry. One must next focus on what McLean as a sophisticated investor reasonably could or should have done under the actual circumstances as they appeared to him at the time without benefit of perfect hindsight. Further, this assessment must be made predicated on the assumption that "[i]ntegrity is still the mainstay of commerce." *Straub v. Vaisman, supra,* 540 F.2d at 598. When one strips away the voluminous record, there were two critical areas where McLean was misled: 1) Existence of actual "hard" sales, and 2) the true story of the Amvit relationship and sales supposedly made by Amvit. The subject matter of those misrepresentations must now be examined for the purpose of ascertaining whether, under the due diligence standard, McLean could or should have discovered the misrepresentation.

■ As to "hard" sales, one must start with the fact that McLean received a current certified accounting statement represented as an independent assessment of Technidyne's financial vitality. As an independent consultant, Schiavi was charged with "fairly presenting" the company's financial profile and above all with retaining his independence from corporate management. Sonde, The Responsibility of Professionals Under the Federal Securities Laws, 69 *N.W.U.L.Rev.* 1 (1973); Symposium, Responsibility of Accountants, 28 *Vand.L.Rev.* 1 (1975). The Schiavi opinion audit aroused no suspicion in McLean. Nor could it be expected to because the accounts receivable were described as "considered fully collectible." As a result, McLean had no reason to, nor did he, investigate or authenticate the sources underlying the report. To do so would have required contact with the four existing "customers." A person in the position of a potential purchaser, indeed a sophisticated buyer, armed with an independent audit could understandably conclude that such an inquiry would represent an unwise, unnecessary and unwarranted intrusion into ongoing affairs. I conclude McLean had no duty to contact Technidyne's customers.

■ Schiavi's report, limited to the first eleven months of 1969, made no representation concerning Technidyne's past dealings with Amvit. If McLean had undertaken a direct investigation of Amvit, his suspicions may have ultimately led to an inquiry which would eventually discredit Schiavi's audit. However, McLean was interested in the future and had information that the product was currently being sold with a minimal sales effort. Under these circumstances, I conclude McLean should not be charged with a duty to document the statements made by Technidyne's officers concerning past dealings because at least their representations regarding current sales were confirmed by the independent audit. The defendant cannot engage in games of hide and seek by first holding himself out as an independent expert and then demanding that plaintiff himself uncover the inaccuracy of the certified financial statement.

■ One final aspect of McLean's conduct not involving the duty to detect misrepresentations, but nonetheless having a bearing upon his duty to use due care, is his failure to retain counsel. Had McLean relied solely upon information supplied by the principals of the corporation and the investment banker, his failure to retain counsel during this transaction would be viewed very critically and may indeed have proved fatal to his recovery. However, he relied upon an independent consultant and if the opinion audit of a public accountant is to have any meaning, it should not require that the investor function as a private detective in ferreting out the true facts on which the accountant's representations are made. Accordingly, I conclude that McLean exercised the requisite due care and justifiably relied on the opinion audit and that he lacked further access by which to discover the fraud of which he complains.

Having established that the defense of due diligence is not substantiated, attention is turned to the remaining defenses: good faith, conformance with generally accepted accounting principles, lack of privity and a defense that a certified audit is merely an expression of opinion.

## Good Faith—Fraudulent Intent

Defendant's reliance on the defense of good faith brings into focus the state of mind of the accountant and the degree of culpability deemed necessary to incur 10b–5 liability. The issue which must be determined is whether on the facts presented in this record, Schiavi's conduct in the preparation of the financial statement constituted such reckless and/or knowing misbehavior as to warrant imposition of liability under section 10(b) and Rule 10b–5. For reasons articulated more fully in a subsequent portion of this opinion,[113] Schiavi's conduct constitutes far more than mere negligence, but falls short of a preconceived actual intent to defraud. His behavior embraces both actual knowledge of material facts not revealed[114] and reckless disregard for the truth.[115] As such, the issue of whether his conduct exposed him to liability under section 10(b) and Rule 10b–5 was expressly left open by *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976):

> "*In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5.*" (emphasis added)

**113.** See pp. 1082–1084, *infra.*

**114.** *Infra* pp. 1083–1084.

**115.** *Infra* pp. 1082–1083.

**116.** *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**117.** *Id.* at 197, 96 S.Ct. at 1383.

**118.** Common law principles of deceit have their origin in the case of *Derry v. Peek,* 14 A.C. 337 (1889) in which the court dealt with liability for misrepresentation contained in a stock prospectus and concluded that negligence is an insufficient basis for common law liability. This position, adopted by a majority of courts, is generally understood to mean that one, who makes a false statement with the consciousness that he has no sufficient basis to justify it or one who speaks with reckless disregard for the truth, is liable in fraud as well as one who deliberately seeks to defraud. W. Prosser,

The Supreme Court in *Hochfelder* "granted certiorari to resolve the question of whether a private cause of action for damages will lie under § 10(b) and Rule 10b–5 in the absence of any allegation of 'scienter'—intent to deceive, manipulate, or defraud." It answered the question in the negative. Having limited its decision to the necessity for scienter and having expressly noted it was leaving open the question of whether recklessness constituted intentional conduct arising to the requisite degree of scienter for purposes of imposing civil liability under section 10(b) and Rule 10b–5, it is concluded *Hochfelder* should not be treated as being in any way dispositive of the issue before this Court.

However, *Hochfelder* does serve as a starting point for analysis. It defined "scienter" as the "mental state embracing intent to deceive, manipulate, or defraud."[116] Further, it stated "that § 10(b) was intended to proscribe knowing or intentional misconduct."[117] It necessarily follows that scienter for purposes of imposition of civil liability under section 10(b) and Rule 10b–5 encompasses knowing or intentional misconduct. If the result were otherwise, Section 10(b) and Rule 10b–5 would be more restrictive in substantive scope than the substantive law of fraud. Reckless disregard for the truth is also a cognizable basis for liability in common-law fraud actions.[118] There is no hint in *Hoch-*

Torts at 700–01 (4th ed. 1971). See also, discussion *infra* pp. 1085–1086.

Specifically, the issue of common law liability of the accountant who prepared a misleading financial statement was artfully addressed in *Ultramares v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). Judge Cardozo rejected negligence as a basis for liability against third parties because it would expose accountants to a liability in "an indeterminate amount for an indeterminate time to an indeterminate class" due to a "thoughtless slip or blunder, [or] the failure to detect a theft or forgery." However, Cardozo recognized an important distinction between "innocent misrepresentation" and "willful or reckless representation essential to the maintenance at law of an action for deceit." *Id.* at 444, 447.

Later courts have reasoned that, if reckless disregard for the truth was deemed culpable behavior at common law, logic dictates that the federal securities laws were intended to em-

*felder* that the Court intended a radical departure from accepted principles. The language of the Court expresses its modest aspirations: "We think the [legislative history] supports our conclusion that 10b was addressed to practices that *involve*[119] some element of *scienter* and cannot be read to impose liability for negligent conduct alone."[120]

The legislative history described by the Supreme Court as "bereft of any explicit explanation of Congress' intent"[121] is directly supportive of a conclusion that knowing or intentional misconduct of the nature found in the instant matter, would constitute scienter. The Senate Report of S. 3420 provides:

". . . if an investor has suffered loss by reason of illicit practices, it is equitable that he should be allowed to recover damages from the guilty party . . . . The bill provides that any person who unlawfully manipulates the price of a security, or who induces transactions in a security by means of false or misleading statements, or who makes a false or misleading statement in the report of a corporation, shall be liable in damages to those who have bought or sold the security at prices affected by such violation or statement. In such case the burden is on the plaintiff to show the violation or the fact that the statement was false or misleading, and that he relied thereon to his damage. *The defendant may escape liability by showing that the statement was*

*made in good faith."* (emphasis added) S.Rep.No. 792, 73d Cong., 2d Sess. 12–13 (1934)

In citing the above quoted Report, the Supreme Court stated:

"There is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith. The catch-all provision of § 10(b) should be interpreted no more broadly." 425 U.S. 185, *supra*, 96 S.Ct. at 1387.

While section 10(b) "should be interpreted no more broadly," there is no need or justification for construing it more narrowly. Since a good faith defense is appropriate only in negligence actions, one may conclude that Congress intended 10(b) to govern reckless, knowing, or deliberate conduct, none of which are negatived by the defense of good faith.

Finally, the Supreme Court having explicitly left undefined the parameters of scienter, the law of the Circuit Courts controls. The disagreement (now set to rest by *Hochfelder*) among the Circuits was whether scienter was required or whether mere negligence sufficed. There has not been any controversy that some degree of scienter, short of actual intent to deceive, was sufficient upon which to predicate liability. Apart from the three Circuits which nominally at least had accepted a negligence standard,[122] the remaining Circuits, have simply required some form of scienter but none have rejected any one degree of scienter as insufficient in private damage actions.[123]

---

brace recklessness as well. *Trussell v. United Underwriters*, 228 F.Supp. 757, 772 (D.Colo. 1964) (applying Colorado common law fraud).

119. Emphasis added.

120. *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. 185, 96 S.Ct. 1375.

121. *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. 185, 96 S.Ct. at 1385.

122. *White v. Abrams*, 495 F.2d 724 (9th Cir. 1974); *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967); *Kohler v. Kohler Co.*, 319 F.2d 634 (7th Cir. 1963).

123. *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973) (reckless disregard for truth); *Rochez Bros. Inc. v. Rhoades*, 491 F.2d 402 (3d

Cir. 1974) (knowledge of undisclosed facts); *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970) (general allegation of fraudulent activity) and *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir. 1974) (some culpability beyond mere negligence); *Texas Continental Life Ins. Co. v. Dunne*, 307 F.2d 242 (6th Cir. 1962) (intent may be inferred from knowledge); *Clegg v. Conk*, 507 F.2d 1351 (10th Cir. 1974) (conscious fault).

The Circuit Courts have also demonstrated no difficulty in applying the standards of recklessness and knowing misconduct in other contexts. Both have been the basis of criminal liability in many areas of diverse fraudulent activity including Rule 10b–5 violations by accountants. *U. S. v. Natelli*, 527 F.2d 311 (2d

One of the most outspoken courts on the scienter requirement has been the Second Circuit. In *Shemtob v. Shearson Hammill & Co.,* 448 F.2d 442 (2d Cir. 1971), the court distinguished between the deliberate intent to defraud and *scienter,* by holding that allegations of facts of one *or* the other was required to find liability under section 10(b) or Rule 10b-5. It elaborated by stating a complaint was insufficient "in the absence of allegation of facts amounting to *scienter,* intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud." 448 F.2d at 445. In *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir. 1973), the Second Circuit described the burden of plaintiff under the *Shemtob* test as

"... a plaintiff claiming a violation of Rule 10b-5 who cannot prove that the defendant has actual knowledge of any misrepresentations and omissions must establish, in order to succeed in his action, that the defendant's failure to discover the misrepresentations and omissions amounted to a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge." *Id.* at 1305.

It thereafter summarized the *scienter* requirement for section 10(b) and Rule 10b-5 purposes as "a willful or reckless disregard for the truth." *Id.* at 1306.

The Third Circuit position on scienter is developing cautiously. Thus far, it has not required an actual intent to defraud but rather has acknowledged that "there is considerable authority against interpreting a scienter requirement as equivalent to a showing of intent to defraud." [124] *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 407 (3d Cir. 1974). Specifically, the Third Circuit

has held in non-disclosure cases that "[d]efendant was under a duty to disclose all material facts to plaintiff, and his failure to do so when he had actual knowledge of those facts satisfies any scienter requirement." *Id.* at 407-08. *Accord, Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 584 (3d Cir. 1975); [125] *Fenstermacher v. Philadelphia National Bank,* 493 F.2d 333, 340 (3d Cir. 1974).

I find no rational reason why actual knowledge of omitted material facts, sufficient to establish scienter in non-disclosure cases, is not equally sufficient in this case of misrepresentation where defendant has knowledge of either the actual misrepresentation or the material omissions. Accordingly, I find the requisite scienter essential to liability under 10(b) and Rule 10b-5 is present in the form of knowing misconduct,[126] in that Schiavi had actual knowledge of material facts which he failed to disclose in his opinion audit.

The facts also establish that Schiavi made reckless misrepresentations. On December 10, 1969, when requested by Technidyne to provide a certified audit (with a cut-off date of November 30, 1969), Schiavi was no stranger to Technidyne. He had provided professional accounting service to it since 1967 and had instructed Technidyne's secretary in the use of an internal bookkeeping system which he had devised. Informed of Technidyne's serious cash shortage, Schiavi was aware that his certified audit would be available to the investing public in efforts to attract a capital infusion.

To ascertain the amount of receivables, Schiavi reviewed outstanding purchase orders and invoices of Technidyne's four cur-

Cir. 1975), and *U. S. v. Simon,* 425 F.2d 796 (2d Cir. 1969).

**124.** The Third Circuit also noted that "[a]ccording to a leading scholar, 'no 10b-5 decision squarely requires "intent to defraud," or clearly equivalent phrases.' A. Bromberg, *supra,* ¶ 8.4(543) at p. 204.175." *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 407 n.7 (3d Cir. 1974).

**125.** The language of the court: "[W]e need not grapple at any length with the division of authority on whether an actual intent to defraud

must be proved" is construed to mean that the facts as presented there created no necessity to enter the then active debate revolving around whether scienter was required or mere negligence was sufficient. The court cannot mean that it intended to leave open the question of whether actual intent to defraud is required because it held that knowledge and failure to disclose were sufficient to provide an adequate basis for 10b-5 liability.

**126.** See discussion *infra* pp. 1083-1084.

rent customers. These accounts represented the first alleged sales in over one year, i. e., from the time of termination of the exclusive dealership with Amvit. There were obvious conflicts between the three major purchase orders and their respective invoices regarding billing dates and delivery dates, such that the earlier dates on purchase orders were changed to future dates on the invoices. Although one purchase order called for payment on a date certain, the invoice deferred payment to a later time. In light of the cash shortage, one might reasonably have expected that Schiavi would seek an explanation from management as to the internal inconsistencies and the justification for delayed payments.

At the time of issuance of the audit, one account was overdue even under the deferred payment date—another signal to confer with management. Delivery information was ambiguous with instructions varying among "as arranged," "as soon as possible," "see attached," "as sold." When Schiavi observed the segregated units at Technidyne's warehouse, he asserts he assumed that there was a bill and hold practice such as was used in the past with Amvit. However, Schiavi's assumption was unsupported by any evidence of the characteristics which depicted the Amvit agreement such as an underlying contract, down payment and regular paid monthly bills. The absence of a track record or a formal contract with any of the existing customers generated grounds for further inquiries of management. Schiavi's own expert witness testified that as an accountant, he himself would have sought inquiry into the internal inconsistencies and the confirmations before certifying the accounts receivable as "considered fully collectible." [127]

Schiavi's assertion that management's signature on the final representation letter discharged his duty of inquiry is specious. A representation letter signed by management at the time of completion of the audit is at best a general statement that the audit is basically correct. It is the statement of an interested party and thus is no substitute for the independent evaluation of the accountant. Thus, in no way is a representation letter an excuse for the failure of Schiavi to question management on discrepancies or to seek explanations regarding the nature of their accounts.

An opinion audit requires independent verification by the accountant of the amounts receivable. The confirmations mailed out by Schiavi, requested the customers specifically to identify their orders as sales or consignments. When only one of the four customers returned the confirmation, Schiavi advised Technidyne of the sparse response. Thereafter, on December 29th, two telegraphic messages were phoned in to Schiavi's office within an hour of each other, allegedly from Smith and Southern Laser acknowledging orders of 5 and 10 units respectively but without expressly recognizing a debt. On this basis, with the acknowledgment of one disputed debt, one no-response on an account of $5,000 and 2 non-responsive telegrams not actually received until after the report was issued, Schiavi represented that $73,733 was a fully collectible debt—this despite the fact that only $3000 was actually confirmed.

Pressed for an early release of his report, Schiavi accommodated his client by abandoning all caution. Schiavi knew the resulting audit was misleading because he possessed material information which members of the investing public did not—e. g., that the confirmations were not authenticated, that the underlying documentation of the "sales" transactions contained discrepancies, that there existed no guarantee of payment as had been the situation with Amvit, that both delivery and payment were set in the future, that the laser equipment was retained at Technidyne's warehouse, that there was no response from customer Robbins, that customers Southern Laser and Smith acknowledged only existence of orders and not debt, and that the only remaining customer, Erie, disputed the

127. Docket No. 178P at 38.

amount due on its account. Thus, Schiavi had facts at hand from which he knew that unless management supplied adequate satisfactory explanations, there were serious potential problems about the accounts receivable and Technidyne's sales future. In short, Schiavi was in a position to evaluate Technidyne's sales future but plaintiff was not. Had plaintiff been informed of the assumptions, speculations and circumstantial evidence on which Schiavi's audit was based, the plaintiff could have rendered the informed judgment which the federal securities laws seek to promote.

■ I also find Schiavi pretended to knowledge he did not have, a finding which on this record, is regarded as reckless disregard for the truth. There is little reason to distinguish between knowing misbehavior and reckless misbehavior under Section 10(b) and Rule 10b–5. In practice, one who recklessly makes a statement inherently possesses some knowledge of its falsity. The common law,[128] precedent in other fields,[129] and the legislative history of 10(b)[130] all buttress the viewpoint that 10b–5 liability ought to attach upon a showing of recklessness.

The case most closely analogous to that *sub judice* is *Herzfeld v. Laventhol,* 378 F.Supp. 112 (S.D.N.Y.1974). *Herzfeld,* characterized by the court as a case of misrepresentation, placed liability upon an accountant because he had actual knowledge of material facts which he failed to disclose. The court might have easily assigned liability on a finding of recklessness. Strikingly similar to the case at bar, *Herzfeld* involved an accountant who was retained by a real estate syndicate for purposes of preparing an audit for the 11 month period ending November 30, 1969. His report, intended to generate capital investment, reflected current earnings purportedly derived from the sale of certain nursing home properties. The sale in reality was no more than an option exercisable at the discretion of the buyer. The court reviewed the procedures which the accountants had followed in certifying this transaction as a sale and concluded that, although there was no outright fraud, defendants had knowledge of material facts which they failed to disclose. Specifically, the court found *inter alia* that the accountants, upon a review of the contract of sale, had knowledge of and a duty to report the ambiguity of the supporting documentation, the nature and worth of the buyer, the magnitude of the transaction and the impact on the company should the transaction abort. The court further found that the disclaimer issued by the accountant was itself misleading, particularly in its use of the word "acquired." Thus, despite the precautionary efforts of the accountants in obtaining the opinions of other accountants and lawyers regarding the contract of sale, the court found the audit seriously deficient and imposed 10b–5 liability.

■ The differences between *Herzfeld* and the instant case are as important as their similarities. Schiavi conferred with neither accountant nor attorney. He accepted at face value whatever was provided him by Technidyne and did not pursue inquiry even of Technidyne's management. Schiavi did not issue a disclaimer nor even qualify his statement with regard to accounts receivable. On the contrary, with the barest of information and misinformation, he certified the receivables as "considered fully collectible." Whatever the terminology may express to the professional accountant regarding the absence of a bad debt reserve, the investing public, however sophisticated, may reasonably infer that the use of this language presumes some hard knowledge that accounts receivable both exist and will be paid. One can only conclude that Schiavi assumed the accounts represented sales, assumed they were on a bill and hold procedure and assumed that the customers were credit-worthy. To des-

---

**128.** *Supra* 1080 n. 118, *infra* pp. 1085–1086.

**129.** *Supra* 1081 n. 123.

**130.** *Supra* p. 1081.

ignate an account "considered fully collectible" on the basis of assumptions without requesting proper documentation or verification from management is no more than a reckless disregard for the truth.

■ Defendant's remaining defenses: compliance with general accepted accounting principles (GAAP) [131] and lack of both warranty and privity are all without merit. Defendant's contention that he acted in accordance with GAAP is both questionable and unavailing. As early as 1942, the SEC took the position that reliance upon the GAAP is not a complete defense to charges of inadequate disclosure. In re *Associated Gas & Electric Co.*, 11 SEC 975, 1058–59 (1942). Likewise modern courts have decided that conformity with GAAP is not determinative of 10b–5 liability. *U. S. v. Simon*, supra, and *Herzfeld v. Laventhol*, supra.

In fact, standards set out in GAAP require that an accountant must issue a disclaimer when he has substantial doubts as to material assertions and when the scope of his examination is restricted by his client. The Court however declines to outline the proper course of action for an accountant in Schiavi's position; what is suitable accounting practice in one situation may be entirely unsuitable in another. An accountant simply cannot permit himself to be stampeded into a misleading audit, even if he can justify, when viewed in isolation, each of the steps he has taken. Thus, if adherence to GAAP does not "fairly present" the financial picture of the subject company, reliance on GAAP is misplaced. Sonde, Responsibility of Professionals Under the Federal Securities Laws—Some Observations, 68 *N.W.U.L.Rev.* 1 (1973).

■ That defendant did not prepare his report specifically for McLean hardly negates the duty owed by the defendant to plaintiff. Courts have uniformly recognized a duty between professionals and third parties under the federal securities laws as well as the common law. Annota-

tion, *Liability of Public Accountant to Third Parties*, 46 A.L.R.3d 979 (1972); Prosser, Misrepresentation and Third Persons, 19 *Vand.L.Rev.* 231 (1966).

In *Shapiro v. Merrill Lynch*, 495 F.2d 228 (2d Cir. 1974), the Second Circuit held an underwriter liable to private investors with whom they had no direct dealings. Reasoning that the nature of the transaction is less important than defendant's duty to disclose, the court recited that privity is more the exception than the rule for 10b–5 liability. Bromberg § 8.5(511) at 207.

■ Under common law principles, liability is likewise established when the plaintiff is an unidentified member of a group or class and the defendant has the purpose of influencing any of the members of the class even if the defendant makes the misrepresentations gratuitously without any personal interest in the outcome. Annotation, supra, 46 A.L.R.3d 979, 1003 (1975). Prosser, Misrepresentations and Third Persons, 19 *Vand.L.Rev.* 231, 233–34 (1966).

An accountant who expects and has special reason to know that his report will be used by members of the investing public, as Schiavi did, has little room for complaint when in fact his report is so used. Liability in such a situation is easily established. *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 167 (3d Cir. 1973); *Herzfeld v. Laventhol*, supra; *Ultramares v. Touche*, supra. See also Prosser, Misrepresentations and Third Persons, 19 *Vand.L.Rev. 231, 246 (1966)*.

■ Likewise, defendant's claim that his was an issuance of opinion and not fact hardly warrants a response. The weight of a CPA's opinion audit is presumed to have a basis in fact and not in speculation.

*Common Law Liability*

The plaintiff's claim for relief under state law merits only summary treatment in that common law fraud in Delaware is estab-

---

131. American Institute of Certified Public Accountants, Statements of Auditing Standards, No. 1—Codification of Auditing Standards and Procedures (1972).

lished under this record on much the same grounds that warrants remedial action under 10b–5.

The elements of common law fraud are set out in the seminal case of *Nye Odorless Incinerator Corp. v. Felton,* 5 W.W.Harr. 236, 162 A. 504 (Del.Super.1931). The court there considered an action in deceit based on the fraudulent misrepresentations allegedly made by a corporate president to a prospective purchaser during the course of negotiations for the sale of the company's assets. In analyzing the allegedly fraudulent conduct, the court held:

"In order to support an action of this kind, it is necessary . . . (1) that the defendant made a substantial, material representation respecting the transaction; (2) that it was false; (3) that when he made it he knew that it was false; (4) that he made it with the intention of inducing the plaintiff to act upon it; (5) that the plaintiff was misled thereby and in reliance thereon, did act upon it, and there upon suffered damage."

In light of what has been said earlier in this opinion as to the wisdom of considering recklessness as the basis for 10b–5 liability, it is instructive to read the court's elaboration on the third requirement set out above, i. e., the knowledge of the defendant. The court stated:

"when he made the representations he must either have known that the representations were false, or that he must have spoken with a reckless indifference to the truth of the matters and without knowledge of their truth, intending that the person to whom the representations were made was to act upon such statements as if they were true." *Nye Odorless Incinerator Corp. v. Felton,* 5 W.W. Harr. 236, 162 A. 504, (Del.Super.1931).

▬ Regarding fraudulent intent, some amplification of point 4 above may be desirable. The intent to induce or deceive has been defined to "involve the intent that a representation shall be made to a person or class of persons, that it conveys a certain meaning, that it shall be believed and that

it shall be acted upon in a certain way." W. Prosser, Torts 700 (4th ed. 1971). Therefore, the intent to induce means only that the actor intended or foresaw the eventual use made of his information; no evil intent is required. In the instant case, Schiavi directed his report to the investing public with the knowledge that its purpose was to secure a capital investment. The report motivated the plaintiff to act upon it and in so doing the latter incurred a loss which is attributable to the defendant.

▬ At common law as well as under the securities law, the plaintiff has a duty to act with reasonable prudence in his business dealings. 5 W.W.Harr. at 250, 162 A. at 510; *Eastern States Petroleum Co. v. Universal Oil Products Co.,* 24 Del.Ch. 11, 3 A.2d 768 (Del.Ch.1939). The plaintiff in *Eastern, supra,* sought cancellation of a patent license agreement alleging that the agreement had been induced by false representations made by the defendant. The court rejected defendant's contention that the plaintiff had improvidently relied upon statements which were intended by defendant as opinion and concluded that the plaintiff "had the right to regard the defendant's agents as experts and [thus] had the right to regard the defendant's statements as representations of fact." *Id.* at 776–77. Similarly, McLean reasonably relied when he accepted the representations of an expert certified public accountant as having a basis in fact.

▬ It is held that the evidence adduced at trial has established that each element of common law fraud under Delaware law is satisfied. *Twin Coach Co. v. Chance Vought Aircraft, Inc.,* 2 Storey 588, 163 A.2d 278 (Del.Super.1960). Thus, the Court finds defendant accountant liable under both 10b–5 and common law fraud. Until the parties have the opportunity to be fully heard on the issues of damages and the cross-claim seeking contribution, the Court makes no determination as to those matters.

Submit order on notice.