**In the Matter of the PHOENIX, LTD.,
t/a Chequers, Ltd., Debtor.**

**Jerome A. POOLE, William L. Curry,
Individually, and the Phoenix, Ltd.,
t/a Chequers, Ltd., Plaintiffs,**

**v.**

**C. Glen DUGDALE, William K. Dugdale
and George H. Skinner, Defendants.**

**Bankruptcy No. 85–452.
Adv. No. 85–82.**

United States Bankruptcy Court,
D. Delaware.

June 12, 1996.

Wayne J. Carey, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE, for Plaintiffs.

Robert D. Goldberg, Biggs & Battaglia, Wilmington, DE, for Defendants.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Chief Judge.

In this adversary proceeding, the plaintiffs seek rescission of a contract, damages from the defendants, and other equitable relief. This is the court's decision after a three day trial on this proceeding.[1] All plaintiff and defendant parties have consented to the entry of a final judgment by this court. 28 U.S.C. § 157(c)(2).

### I. Facts

Chequers, a Delaware corporation, was established in 1973 as a retail men's clothing store. In 1977, it relocated to Market Street in Wilmington, Delaware, where it remained until closing. Prior to 1984, defendants C. Glen Dugdale and William K. Dugdale controlled Chequers through their ownership of all the issued and outstanding stock of Chequers (200 shares). Mark Undorf managed Chequers on a day to day basis. Other employees included John Suder, a salesman, and Alice Deese, a bookkeeper. Two other stores named Chequers existed: one in Baltimore and one in Pittsburgh.

In early 1984, the Dugdales decided to sell their stock. They approached Suder, who was interested, but financially unable to purchase the stock. Suder contacted Jerome A. Poole, a long time friend of his. Poole was interested, and in turn solicited William L. Curry, a business partner. Poole and Curry were primarily in the business of selling financial products such as insurance, mutual

---

**1.** The court appreciates the recent submission by the plaintiffs and defendants of the descriptive summaries of their respective exhibits, which facilitated the court's review of the record.

funds and tax shelters. Neither had previously invested in, or managed a retail clothing business. Poole and Curry had considerably more financial resources than Suder, and the three decided to consider the purchase of Chequers.

## A. The Investigation and Negotiations of the Purchasers

During February and March of 1984, the three prospective purchasers investigated the finances and operations of Chequers, and negotiated with the Dugdales over the terms of the sale. Sale negotiations were primarily between Poole and Glen Dugdale.

Since Suder worked at Chequers, he was primarily responsible for obtaining financial information, and he did so, from either Glen Dugdale or Deese. For example, Suder requested and received a listing of accounts payable in March. Inventories were normally taken at the end of February and August (the end of Chequer's two selling seasons), and Suder himself conducted the inventory at the end of February 1984. Suder then passed on all the information he received to either Poole or Curry.

Poole and Curry were primarily responsible for evaluating the financial information concerning Chequers. Curry requested and received from the Dugdales prior financial statements of Chequers for the years ending August 1981, August 1982, and August 1983 (Chequers' fiscal year ran from September through the following August). These statements had been compiled[2] by defendant George H. Skinner, a certified public accountant. Skinner had been retained by Chequers in 1978, and had prepared the annual financial statements since that time through April 1984. Skinner attached a cover letter to each of the statements for the years 1981 through 1983 that stated:

Management has elected to omit substantially all of the disclosures and the state of changes in financial position required by generally accepted accounting principles. If the omitted disclosures were included in the financial statements they might influence the user's conclusions about the company's financial position, results of operation, and changes in financial position.

No accountant was hired to review these statements. Neither Poole nor Curry ever asked the defendants about the past operational or accounting practices of Chequers.

The 1981 and 1982 statements showed that Chequers had suffered losses in those years. Glen Dugdale explained to the purchasers that these losses were primarily due to the relocation and other non-recurring expenses. The 1983 statement showed a modest profit. The net income-net worth ratio listed in each of these three financial statements indicated that Chequers was financially distressed. Transcript at 279–80.

Thus, by the time the purchasers had finished their limited investigation, Poole and Curry, the two individual plaintiffs in this proceeding, recognized that Chequers was only marginally profitable. Glen Dugdale similarly characterized Chequers as a little better than break even.

Nonetheless, Poole and Curry were intent on purchasing Chequers. They planned to increase annual sales from the historic level of $220,000 to between $300,000 and $400,000 through sales to friends and acquaintances. E.g., Transcript at 351–53. They also had non-pecuniary reasons for purchasing Chequers, as they wanted to enhance their visibility in the Wilmington business community and above all else, help their friend Suder acquire a business for him to manage.

Although the actual closing for the sale did not take place until April 16, 1984, as an accommodation to the Dugdales, the plaintiffs unofficially began to run the store on April 1, 1984, with Suder as manager. On April 16, the parties executed an agreement drafted by the purchasers' attorney for the purchase of stock of Chequers.

## B. The Closing

The agreement designated three parties:
1. The buyers (Curry, Poole and Suder);
2. The sellers (Glen and William Dugdale); and

2. A "compilation" is an accounting term of art fully explained in section III, infra.

3. The corporation (The Phoenix, Ltd., trading as Chequers).

Pursuant to the agreement, the buyers purchased 164 of the 200 outstanding shares of common stock of the corporation from the sellers for $69,000. Pursuant to a separate redemption agreement, Chequers repurchased the balance of the outstanding shares from the Dugdales for $15,000. The actual transaction included several other financial intricacies, none of which need be discussed.

The sale price was based upon previous financial numbers provided to the purchasers as of March 1, 1984. At the April 16 closing, the purchasers informed the sellers that they wanted certain affirmative statements of no material change. To this end, the stock purchase agreement contained certain warranties regarding Chequers' finances. Some of the warranties went beyond the material change concept. The warranties are the subject of dispute and are discussed in Section III.

## C. *Subsequent Operating History of Chequers*

After the closing, in accordance with their business plan, Poole and Curry made significant changes to the finances and operations of Chequers in an attempt to improve its performance. These changes are fully discussed in Section VII of this Opinion. Chequers' financial condition, however, did not improve. It deteriorated. Suder left his position as manager in March 1985. On November 21, 1985, Phoenix, Ltd., trading as Chequers, filed a Chapter 11 bankruptcy petition. In the beginning of 1986, Chequers showed a deficit that according to one witness was over $160,000. Chequers closed at the end of January 1986. Further findings of facts are developed below as and when appropriate.

## II. *The Complaint*

On December 16, 1985, about 20 months after the 1984 purchase, Poole, Curry, and Phoenix filed this proceeding against the Dugdales and George H. Skinner, the accountant. In the six counts of the complaint, plaintiffs claim breach of warranty, negligent misrepresentation, fraudulent misrepresenta-

tion, aiding and abetting, unjust enrichment, and mismanagement. The complaint requests rescission of the stock purchase agreement and the redemption agreement, actual and punitive damages, attorney's fees, and the imposition of a constructive trust. In their opening brief, plaintiffs explain that they seek actual damages of about $205,000. This figure is comprised primarily of the asserted deficit of $160,000, and $42,000 that Poole and Curry loaned Chequers. Opening Brief at 59–61. In addition to denying the substance of these claims, defendants raise the affirmative defenses of laches, estoppel, and waiver.

The plaintiffs later amended the complaint to allege violations of Section 10(b) of the 1934 Securities Exchange Act. As to these securities claims, the defendants additionally raise a jurisdictional defense and a statute of limitations defense.

## III. *There was no Breach of Warranty That Would Entitle the Plaintiffs to Damages*

■ Count I of the amended complaint seeks indemnification and damages for breach of various warranties in the stock purchase agreement. For a warranty to provide a basis for recovery, the plaintiffs must show a material breach of the warranty, and that the breach was a proximate cause of their damages. *Pittsburgh Coke & Chemical Co. v. Bollo*, 421 F.Supp. 908, 928 (E.D.N.Y. 1976).

■ The first alleged breach of warranty relates to section 4(h) of the stock purchase agreement, which states:

Sellers . . . warrant as follows:

(h) The Corporation has delivered to Buyers copies of the following financial statements: unaudited financial statements for the year ended [sic] August 31, 1983 (the "Financial Statements"). The Financial Statements, including the notes related thereto, represent assets, liabilities and financial condition of the Corporation as of the date thereof and the results of its operations for the period ended [sic] at the date thereof prepared in conformity with generally ac-

cepted accounting principles consistently applied throughout the periods involved consistent with preceding periods.

The August 31, 1983 compilation prepared by Skinner referred to in section 4(h) states the value of the inventory as $107,796. It is not disputed that in August 1983 the retail value of the inventory was $107,796. *See* Plaintiffs' Exhibit 5. The plaintiffs, however, assert section 4(h) was breached in that the financial statements were not prepared in accordance with generally accepted accounting principles (GAAP). GAAP requires that the inventory be reported at the lesser of market or cost. The cost of the 1983 inventory was approximately half that of its retail value.

By way of background, there are three types of reports that a certified public accountant can issue. By definition, the compilation report provides no assurance of the accuracy of the financial information. Financial information presented in a compilation is not necessarily in accordance with GAAP.

A "review" provides limited assurance that the financial statements are in accordance with GAAP and that the CPA has performed certain tasks including inquiry of company personnel and analytical procedures. An audit report is an audited financial statement where the CPA gives his opinion that the financial statements fairly represent the financial positions and operations of the company. An audit entails certain procedures relating to testing of transactions, internal controls, and contemplates a much more detailed examination of the business. Transcript at 218; *see generally* Defendants' Exhibit 8 at 316.

Returning to the plaintiffs' argument that the 1983 financial statement was not prepared in accordance with GAAP ("the GAAP warranty"), the GAAP warranty was inserted into the agreement by the plaintiffs' attorney shortly before the April 16 closing, and was never seen by the Dugdales prior to this date. Prior to this date, there is no credible evidence that the defendants ever represented to the plaintiffs that this GAAP warranty existed.

To the contrary, the August 1983 financial statement attached to the stock purchase agreement and that *was* previously delivered to the plaintiffs had a cover letter written by Skinner stating:

> I have not *audited or reviewed* the accompanying financial statements, and accordingly, do not express an opinion or any other form of *assurance* on them.
>
> Management has elected to *omit* substantially all of the disclosures and the statement of changes in financial position *required by generally accepted accounting principles.* If the omitted disclosures were included in the financial statements they might influence the user's conclusions about the Company's financial position, results of operation, and changes in financial position. Accordingly, these financial statements are not designed for those who are not informed about such matters.[3]

Plaintiffs' Exhibit 3 (emphasis added). This statement was included so that the compilations would not be relied upon, and to make it clear that the CPA was not providing any level of assurance. Transcript at 287, 339; Defendants' Exhibit 8.

Skinner was not a party to the purchase agreement and did not affirm or indeed have any knowledge of the GAAP warranty. The Dugdales were not certified public accountants and thus not competent to rebut the substance of the prior and contrary representation of Skinner. The evidence showed that Glen Dugdale himself did not see the purchase agreement and the GAAP warranty for the first time until minutes before he was asked to sign these documents, and that this was the first time he was aware that the GAAP warranty was part of the purchase agreement.

In these circumstances, it is nonsensical for the plaintiffs to argue that they should be able to assert a breach of section 4(h) by requiring this compilation to comply with generally accepted accounting principles, when by its terms, it was not. *See also* 8 *Williston on Contracts* §§ 972–973, at 497–501 (3d ed. 1964) (discussing limitations on enforceability of warranty where defect is

---

3. The same quoted language appears in the respective cover letters provided to the plaintiffs in connection with the 1981 and 1982 financial statements.

obvious or detected by inspection). Under these circumstances, the defendants have shown that the warranty at issue was not a basis for the April 16 agreement, and that any reliance would have been grossly unreasonable.

■ Plaintiffs next allege two breach of warranties contained in sections 4(h) and 4(j) relating to the accounts payable numbers contained in the 1983 compilation. Section 4(j) of the stock purchase agreement states:

> (j) Except and to the extent [of] the accounts payable at August 31, 1983 and listed in Exhibit B or as reflected in or reserved against the Corporation's Financial Statement, the Corporation has no liabilities or obligations of any nature, ..., except for liabilities or obligations which arose in the ordinary course of business since August 31, 1983; and all liabilities, including without limitation all accounts payable and all payroll or withholding taxes, due or accrued up to and including the Closing Date will as of the Closing Date been [sic] paid or sufficient reserves have been established therefor.

Exhibit B, Skinner's 1983 year-end compilation, listed an accounts payable figure as of August 31, 1993 of $1,228.54. At closing, Glen Dugdale told the purchasers sections 4(j) and 4(h) would have to be modified to reflect accounts payable balance of no more than $1,800, except for liabilities or obligations which arose in the ordinary course of business. The buyers accepted this modification.

The plaintiffs, however, assert that the accounts payable as of August 31, 1983 actually totaled over $18,000, and thus that sections 4(j) and 4(h) were breached in that the warranty that the accounts payable were no more than $1,800 was materially inaccurate.

The plaintiffs' asserted total of $18,000 is incorrect. As Alice Deese, bookkeeper for Chequers through July 1984 explained, the plaintiffs' accounts payable total includes many numbers that did not belong in the accounts payable balance. During her testimony, Deese calculated accounts payable from outstanding invoices, using accounts payable cards (Defendants' Exhibit 15). In her calculations of the accounts payable number, Deese properly excluded certain invoices because the invoice had already been paid, or reflected merchandise that was transferred to another Chequers store in either Baltimore or Pittsburgh (the Wilmington store did not pay the bills of the other stores). Other invoices were excluded because they were actually accounts receivable.

Finally, Deese excluded invoices for fall merchandise because of Chequers' practice of "early birding" and "carry-forward" accounting. As an operational matter, purchasing of inventory at Chequers was divided into the fall selling season and the spring selling season. Fall merchandise was purchased in the late winter or early springtime. Spring merchandise was purchased in late summer or early fall. Transcript at 357. This purchasing practice, called "early birding," allowed Chequers to receive a discount on the merchandise it purchased from its suppliers.

Merchandise for a future selling season remained in the shipping boxes. The invoices would not go to Deese until after the end of the pending season. Transcript at 569. The ordinary practice of Chequers was to pay these future invoices many months later. Transcript at 561. This practice was referred to as the "carry-forward" practice. Both of these practices, while not in accordance with generally accepted accounting principles, were recognized in the industry and used often by small businesses. Transcript at 240–41; 281–83, 319.

Deese's testimony is summarized in defendants' Exhibit 16, which shows an accounts payable figure as of August 1983 of $1,698.04. A separate column of that exhibit indicates fall merchandise not in inventory. Exhibit 16 explains the difference between the accounts payable number contained in the August 1983 financial statement, and the plaintiffs' number of over $18,000. The $1,698.04 figure is less than $1,800, is not materially different from the $1,228.54 figure on the financial statement provided to the plaintiffs, and cannot provide the basis for a breach of warranty damage claim.

The plaintiffs' second warranty argument relating to the accounts payable is that this figure ballooned to $30,000 by April 1984.

*See* Plaintiffs' Exhibit 25A. Assuming that the plaintiffs' dollar figure is correct, it would not support a breach of warranty claim. The increase in accounts payable reflects a large shipment of inventory Chequers received during the months of March and April pursuant to Chequers' inventory purchase practice as explained above. Since the increase in accounts payable (as calculated by the plaintiffs) was offset by a corresponding increase in inventory that benefited the plaintiffs, the materiality requirement has not been satisfied. Transcript at 283, 290–91, 413–14.

Moreover, the evidence is uncontroverted that accounts payable typically surged in March to May each year because of Chequers' early-birding practice. Transcript at 357–58, 365. Poole specifically admitted he understood this aspect of the retail clothing business. Transcript at 636–37. Thus, the increase in liabilities arose in the ordinary course of business, and the ordinary course exception contained within the section 4(j) warranty applies.

Plaintiffs' next warranty claim is that "defendants breached their warranty that the 1983 financial statement accurately represented the present financial condition of the corporation [at closing]." Opening Brief at 50. They argue this warranty exists somewhere (they do not say where) in sections 4(h) and 4(j). It does not. The alleged warranty does not exist.

The plaintiffs' other warranty claims are equally without merit. The parties' arguments about the meaning of the indemnification clause of section 8 of the agreement need not be addressed.

## IV. *The Plaintiffs Have not Shown Common-law Fraud*

■ At common law, fraud consists of:

1. A false representation of a material fact made by the defendant;

2. With knowledge of the falsity, or reckless indifference to the truth;

3. An intent to induce the plaintiff to act or to refrain from acting;

4. The plaintiff's action or inaction is taken in justifiable reliance upon the representation; and

5. Damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983); *Holley v. Jackson,* Del.Ch., 158 A.2d 803, 806 (1959). The first requirement may also be satisfied by deliberate concealment of material facts, or by silence in the face of a duty to speak. 462 A.2d at 1074. Materiality is measured by an objective test which asks whether a reasonable person would attach importance to the misrepresentations in determining a choice of action in the transaction in question. *McLean v. Alexander,* 420 F.Supp. 1057, 1075 (D.Del.1976).

In summary, in Count III, the plaintiffs assert that the defendants mislead the plaintiffs into buying an insolvent company by falsely representing that the financial statements, upon which the plaintiffs relied, accurately reflected Chequers' financial condition. The plaintiffs allege seven material misstatements, and another six material omissions.

### A. *The Defendants Made no Material Misstatements of Fact*

The first five alleged misstatements relate to statements contained in the stock purchase agreement. Opening Brief at 21–22. These have been adequately addressed in Section III, and do not provide a basis for the fraud cause of action.

■ The remainder of plaintiffs' arguments about alleged misstatements are equally without merit. The plaintiffs assert that Glen Dugdale informed them that Chequers was "a healthy business." Transcript at 193. Assuming this statement was made, any reliance on this statement is not justifiable in light of the plaintiffs' much more specific understanding that Chequers was only marginally profitable.

The plaintiffs assert that defendants failed to provide them with financial statements for the years prior to 1981. Plaintiffs assert they explicitly asked Suder to request those statements. However, Suder denied that he was asked to request these statements. The plaintiffs have not proven this assertion. Indeed, the Dugdales had an open door policy, and were happy to give the purchasers any

financial information they desired. Transcript at 401–02.

## B. *The Defendants did not Deliberately Conceal Material Facts*

Plaintiffs allege six material "omissions" (the characterization of defendants' conduct as omissions is the plaintiffs' choice, not the court's). They argue inventory numbers were arbitrarily adjusted to arrive at a desired gross profit margin. This assertion was never proved. The evidence showed that only on two occasions were inventories adjusted, both times in interim statements. The first time was in 1981 to correct for an error due to transferred inventory transferred between stores. Ten percent, or eight thousand dollars, was added to the Wilmington inventory figure to reflect what Glen Dugdale thought was actually in that store. This higher figure was not inflated. Transcript at 443–44.

The second time the inventory figure was increased was in 1982 when the Wilmington inventory was increased by $15,000 to reflect men's clothes inventory located in Ardmore, but promised to the Wilmington store by the Baltimore store in exchange for a previous delivery of women's clothing.

The next alleged omission is that "[t]he defendants never revealed their past practices of transferring inventory between stores located in Baltimore, Wilmington and Ardmore and the accounting problems associated with those transfers." The plaintiffs never proved that there were any accounting problems, or that such problems were material.

■ The remainder of the omissions upon which the plaintiffs rely involve business information or practices about which the plaintiffs allege they were not aware. John Suder, however, *did* know of the business information or practices, either through his employment responsibilities, or because he was told by one of the defendants. Plaintiffs have taken the legal position that Suder's knowledge cannot be imputed to them. The defendants disagree. This dispute must be resolved before the court can address these omissions as a basis for plaintiffs' fraud count.

Plaintiffs recognize the general rule that the knowledge of an agent is imputed to his principals:

> The inquiring agent presumably is an inquiring reporter also. Hence the agent to *investigate a particular subject* binds his principal by the knowledge which he possesses or acquires concerning it. . . . The representative sent to check on property which his principal seeks to acquire charges the latter with his knowledge of facts concerning its character and qualities, or of matters which may affect the title. . . .

3 Merrill On Notice, § 1210 (1952) (emphasis added). Plaintiffs, however, argue that Suder was not an agent of the plaintiffs prior to April 16, 1984.

Suder was a partner of Curry and Poole. *E.g.,* Reply Brief at 29; Transcript at 75, 399. Partners are agents of each other. 6 *Del.C.* § 1509(a). It is unclear from the record, however, when this partnership was formed, and specifically, whether it was in existence for all relevant times. Therefore, the court considers whether, independent of the partnership statute, Suder was acting as an agent of Curry and Poole when he, as a prospective purchaser, acquired information about the business operations of Chequers.

Suder was one of the three purchasers of the Chequers' stock. Suder never negotiated with Poole or Curry over the terms of the stock purchase agreement. All negotiations on behalf of the purchasers was conducted with the Dugdales.

At the end of February, 1984, Suder and the manager, Mark Undorf, performed an inventory of Chequers in anticipation of the upcoming closing of the sale agreement. Even though at this time Undorf was still the manager of the store, Suder was in charge of the inventory, and Undorf assisted. Prior to this inventory, Undorf had always been in charge of inventory, with Suder merely assisting. Suder excluded Glen Dugdale from participating in the inventory process. Normally, he would be involved in the inventory. Finally, Suder calculated part of the invento-

ry at cost rather than retail in anticipation of the potential closing. *See generally,* Transcript at 347, 368, 369, 370, 371, 377–78, 400–401. All the details of this inventory are inconsistent with plaintiffs' "no agency" argument.

In March, Suder assumed other managerial functions. He interviewed and hired a new employee to replace Undorf. Suder bought inventory for the following fall season. He took over other daily operations. *See generally* Transcript at 381–82. Based on all these factors, Suder was an agent of Poole and Curry throughout the investigatory and negotiation process.

Plaintiffs' second argument on the imputed knowledge issue relies upon *Holley v. Jackson,* Del.Ch., 158 A.2d 803, 807–808 (1959). In that case, the plaintiffs were purchasers of realty from the defendants. The purchasers alleged fraud in that the sellers failed to disclose a mortgage lien and a judgment lien that existed on the property. The purchasers sought to rescind the contract for the sale of the property. One attorney handled the closing for both the purchasers and the sellers. The attorney knew of the liens prior to closing. The sellers argued that the attorney was an agent of the purchasers, and that his knowledge of the liens should be imputed to the purchasers.

Then-Chancellor Seitz recognized the general rule that the knowledge of an agent is imputed to his principals. *Id.* at 807 (citing 3 Merrill On Notice, § 1210 (1952)). However, the *Holley* attorney was a common agent, because he also represented the sellers in the real estate transaction. Chancellor Seitz recognized that the presumption that the agent will disclose material facts to his principal does not always apply in the context of a common agent. Specifically, "where the common agent has an interest of his own to serve, the rule of presumed notice is modified." *Id.* at 808. The *Holley* attorney owned the real estate company that would receive a commission if the sale was consummated, and thus the attorney held a personal interest in consummating the sale that was adverse to the purchasers. Chancellor Seitz concluded that the attorney's knowledge

would not be imputed to the purchasers. *Id.* at 808.

The plaintiffs argue that even if Suder was an agent, he was a common agent and that the exception articulated and utilized in *Holley* applies. Plaintiffs have not shown that Suder's employment by the Dugdales made him an agent of the Dugdales for the purposes of the sale of stock. At the relevant times, Suder was a prospective purchaser of the Chequers' stock and acted in the interests of the purchasers. Suder was not a common agent.

Moreover, even if Suder was deemed to be a common agent, he did not have an interest of his own to serve. Plaintiffs first point to Suder's continued employment as a basis for a finding of an adverse interest. However, there is no evidence that during February and March 1983, his continued employment was in any way adverse to Poole and Curry. Indeed, Suder assumed managerial functions in March, and after April 1, 1983, Suder operated Chequers as manager for Poole and Curry. Suder's interest in continued employment was fully coincident with the interests of Poole and Curry. Docket no. 84 at 2; Transcript at 349–50.

Plaintiffs also point to Suder's personal interest in purchasing a share of the business. The court agrees that this interest existed, however it too coincided with the interests of the plaintiffs—to evaluate the Chequers business and to obtain a fair purchase price for the Chequers' stock. Suder did not have an interest adverse to the plaintiffs.

Undoubtedly, Suder had intimate and valuable knowledge of the business to be purchased because of his employment. While most purchasers would consider this an advantage, the plaintiffs here creatively but inappropriately attempt to use his position as a shield.

Plaintiffs' third and final argument that Suder's knowledge should not be imputed to them relates both to the *Holley* case and the plaintiffs' other fraud allegations. Plaintiffs argue that the general rule that knowledge of an agent is imputed to his principal is inapplicable when the principal or partner receiv-

ing actual notice has committed fraud on the partnership, or consents to such a fraud. Reply Brief at 29. The plaintiffs have neither alleged nor proven that the Dugdales directed Suder to withhold information from, or to misstate information to the plaintiffs. As is more fully discussed in other portions of this Opinion, the court finds the defendants have committed no such fraud. In summary, Suder's knowledge is imputed to the plaintiffs.

The following three alleged omissions upon which plaintiffs rely for their fraud count will be addressed together:

1. "Defendants never informed plaintiffs of their practice of not reporting on the financial statements, inventory and accounts receivable received for the next selling season."

2. "The defendants never disclosed the fact that the inventory figures reported on the financial statements were valued at retail rather than the lower of cost or market."

3. "Defendants neglected to inform plaintiffs of the practice of borrowing to buy inventory and paying down that debt as the inventory was sold off."

Opening Brief, at 23–24. In each of these instances, Suder knew of the business practice. Transcript, at 349, 350–51, 354–55, 356–58.

The plaintiffs also argue that "[t]he inventory figure, taken by the defendants' employees on March 1, 1984, was never reported to plaintiffs." Opening Brief at 23. First, Suder was in charge of this inventory and knew the figure. Second, Suder did report this figure to his co-purchasers.[4]

To the extent plaintiffs allege other misrepresentations or omissions, they are without merit.

### C. Any Reliance by the Plaintiffs was not Justifiable

Plaintiffs have also failed to prove the other elements of a *prima facie* claim of fraud.

For instance, the plaintiffs have not shown reliance on the financial statements, as Poole and Curry admit that:

[They] decided to purchase Chequers' stock, believing the business (a) could be *marginally* profitable, (b) would enhance their visibility in the Wilmington business community and (c) *above all else*, was an opportunity to help a friend, John Suder, get into business.

Opening Brief, at 5 (emphasis added).

Moreover, any reliance on the alleged misrepresentations or omissions would not have been justifiable. The cover letters to the compilations disclosed defendants' accounting practices. The preponderance of the evidence showed that Poole and Curry should not have relied upon compilations. *E.g.,* Transcript at 339.

### D. Plaintiffs' "Damages" Were not Caused by the Defendants' Conduct

As is discussed in section VII.B., the plaintiffs have not shown that the damages to Chequers were caused by defendants' conduct.

### E. No Intent was Shown

The challenged accounting and operational practices were in place years before Poole and Curry became interested in purchasing Chequers. Plaintiffs never proved that the defendants knew that the early-birding and carry-forward practices did not accord with GAAP. Plaintiffs did not prove the intent requirement of fraud.

### V. Plaintiffs' Other Causes of Action are Without Merit

The plaintiffs have also asserted counts of negligent misrepresentation, unjust enrichment, mismanagement, and violations of 15

---

4. Suder testified to this. *E.g.,* Transcript at 348. While Curry denied receiving the $63,000 inventory figure, it is not credible that Curry would ask for this inventory number. Transcript at 628, and then go ahead with the sale without this number. Moreover, the plaintiffs never explained why the defendants would provide this number to the Bank of Delaware, which was financing Poole and Curry's purchase, if the defendants were trying to hide this number. *E.g.,* Transcript at 67, 628.

U.S.C. § 78j(b) (Securities Exchange Act).[5] To the extent these causes of action are cognizable, they are based upon essentially the same set of alleged facts, and are equally without merit for the reasons discussed in Sections III, IV and VII.

## VI. *Skinner is not Liable to the Plaintiffs*

In Count II of the complaint, plaintiffs seek damages from George H. Skinner for negligent misrepresentation of the financial status of Chequers. In Count IV, plaintiffs seek damages from Skinner for aiding and abetting the perpetration of the fraud. Many of the underpinnings to these two Counts have been previously addressed and have been determined to be without merit. *See generally* sections III–V, *supra.* In addition, on the basis of the expert testimony presented, the court finds that Skinner did not breach any duty of care to the plaintiffs. Counts II and IV are without merit.

## VII. *Laches Bars any Right of the Plaintiffs to Seek Damages or Other Relief*

In addition to the plaintiffs' failure to establish any of their causes of action, defendants have proven a valid affirmative defense. While the defendants raise the affirmative defenses of laches, estoppel, and waiver, only the laches defense need be discussed.

Plaintiffs erroneously assert that "[l]aches is not an issue in this case." Reply Brief at 30. Laches was timely raised in defendants' answer, docket no. 7, Affirmative Defense II, and then again in the pre-trial order. Docket no. 66 at 8, ¶ 8.

As will be discussed below, defendants' laches defense generally argues that soon after purchasing Chequers, plaintiffs discovered any accounting practices not in accordance with generally accepted accounting principles, as well as financial information inconsistent with their understanding of the warranties. Rather than advising the defendants of these discoveries, the plaintiffs continued to run the business, and exacerbated the weak financial condition of Chequers

through their own conduct. Only when their own efforts had utterly failed did the plaintiffs decide to sue the defendants.

Before turning to a detailed discussion of the laches defense, the court observes that a survey of other reported cases involving laches or similar defenses in the context of a sale of a business supports defendants' position. For instance, in *Wetterow v. White,* 71 Idaho 372, 232 P.2d 973, 975 (1951), the court held that plaintiffs had waived the right to rescission or damages where they had operated a tavern for 20 months before closing it.

*Saba v. Miller,* 327 Mich. 363, 41 N.W.2d 894 (1950) involved the sale of a wholesale and retail grocery and meat business. The plaintiff operated the business for about two months, and then closed the store and sought rescission. The court found the defendants had deceived the plaintiff into thinking there was more than the actual amount of inventory by careful rearranging of stock, and through the use of empty boxes. Upon taking possession, the plaintiff rearranged the stock again, threw out the empty boxes and certain spoiled goods. The court held that this conduct waived the plaintiff's right to damages for the misrepresented amount of inventory, and that furthermore, the plaintiff was not entitled to an accounting for business losses attributable to her own mismanagement, default or neglect. *Id.* 41 N.W.2d at 897–98.

*Sy–Jo Luncheonette v. Marsav Distributors,* 279 A.D. 715, 108 N.Y.S.2d 349, 350–51 (1951) (per curiam) involved plaintiffs' purchase of a luncheonette from defendants. Plaintiffs had first made an independent investigation of the business. In their rescission action, plaintiffs claimed defendants misrepresented the weekly income. The plaintiffs discovered the alleged fraud within the first week after the purchase, but continued to operate the business for two months. During that time, they inaugurated new policies which contributed to the decline in sales. Four months after the discovery of fraud, the plaintiffs finally sought to rescind. The court assumed the fraud, but held that the attempted rescission was not timely.

---

**5.** The defendants presented no argument in their brief concerning the defense of lack of subject matter jurisdiction. The court considers this argument abandoned.

 In order for the defendants here to prevail on the defense of laches, they must show that the plaintiffs had knowledge of their claim, that they unreasonably delayed in asserting their rights, and that there was an intervening change in conditions prejudicial to the defendants. *Skouras v. Admiralty Enterprises, Inc.,* Del.Ch., 386 A.2d 674, 682 (1978). The defendants have the burden of proof to establish laches. The following is conceded by the plaintiffs, or proven by the defendants.

### A. *The Plaintiffs had Knowledge of Their Claim*

After the April 1984 purchase, the plaintiffs began receiving dunning calls from creditors seeking payment for outstanding invoices for merchandise supplied to Chequers. Later in April, after investigation, the plaintiffs learned that there were over $30,000 in accounts payable owed suppliers. Curry stated that this "fact" alone would have been sufficient to deter him from purchasing Chequers. Transcript at 109. And at this time, the plaintiffs also knew through Suder that the inventory was priced at market value rather than at cost. Opening Brief at 13 n.*

Plaintiffs have argued that other "undisclosed problems" existed. However, some of these "problems" were known to the buyers prior to closing. Others were not material to Chequers' finances. As Professor Stiner pointed out, small businesses typically have weak accounting controls, and operate on a cash basis. Transcript at 319–20. In short, the plaintiffs cannot rely on these other "undisclosed problems" to assert that they did not know of the material financial condition of Chequers until well after the April sale.

The most telling statement on the issue of when the plaintiffs discovered the basis for the alleged fraud and warranty claims is found in their pre-trial letter memorandum. On page 2 of that letter they state: "It was *not long* after the closing before the Buyers knew that they had been duped." Docket no. 84 (emphasis added).

The defendants have shown that the plaintiffs had knowledge of their claim no later than April 30, 1984.

### B. *The Plaintiffs Unreasonably Delayed in Asserting Their Rights*

After discovering these problems, rather than contacting the defendants, the plaintiffs took extensive efforts to improve the profitability of Chequers. In their own words, despite their knowledge, Poole and Curry decided to move forward with the sale and "try to make it." Transcript at 80.

The plaintiffs "tried all sorts of things to revive the business." Docket no. 84 at 2. They commenced an advertising campaign. They held an open house to promote the change in ownership, and to encourage personal friends to buy their clothes at Chequers. In the summer of 1985, they provided additional debt financing of $42,000 to Chequers. The plaintiffs never advised the defendants of problems with Chequers during the entire time period from the date of sale (April 16, 1984) to December 16, 1985, the date the complaint was filed. Thus, plaintiffs delayed for about 20 months after they had sufficient knowledge of Chequers' finances before seeking judicial relief. The delay in filing the complaint was grossly unreasonable.

### C. *There was an Intervening Change in Conditions Prejudicial to the Defendants*

At the time of the sale of Chequers, the business was marginally profitable. During the next 20 months, the plaintiffs materially changed the operations of Chequers. They increased expenses. They reduced prices, thus decreasing revenues. They authorized Chequers to repurchase $15,000 of corporate stock. Chequers' finances worsened significantly. When Chequers filed its bankruptcy (shortly before the complaint was filed), its schedules listed assets of about $13,000, and debts of about $178,000. Case No. 85–452, docket no. 10. In contrast, the August 31, 1983 statement listed current assets of $77,020 and current liabilities of $70,410.[6] This comparison. Plaintiffs' Exhibit No. 23.

---

6. The court has utilized the plaintiffs' restated numbers for August, 1983, to allow for a direct

change in Chequers' financial condition disables the defendants from returning to operating the business as before the sale, and inhibits their ability to defend against plaintiffs' claims of damages. Defendants have shown prejudice. *See generally Saba v. Miller,* 41 N.W.2d at 898; *Sy–Jo Luncheonette,* 108 N.Y.S.2d at 351.

Poole and Curry made a business investment. Risk inheres in such investments, especially in a thinly capitalized business such as Chequers. Transcript at 319–20. The plaintiffs knew *before the sale* that Chequers was only marginally profitable. Prior to the sale, they had developed a marketing plan to improve profitability through various means. After the purchase, they spent 20 months implementing their plans. These plans failed. The plaintiffs essentially ask this court to allow them to invest risk-free. Allowing these plaintiffs to proceed on their claims would be inequitable. Defendants have proven laches.

## VIII. *Conclusion*

An order in accordance with this Opinion is attached.

### ORDER

AND NOW, June 12, 1996 for the reasons stated in the attached Memorandum Opinion, IT IS ORDERED THAT:

1. The plaintiffs have not proven that any of the defendants breached any warranty, or engaged in any common law fraud, mismanagement, aiding and abetting, negligent misrepresentation, or any inequitable conduct. The plaintiffs are not entitled to any legal or equitable relief requested in counts one through seven.
2. Judgment on the affirmative defense of laches (Count II) is entered in favor of the defendants.